**TURNBULL, INC., Individually and Turnbull, Inc., and A. & H., Inc., Co-Venturers**

v.

**The UNITED STATES.**

**No. 319–60.**

United States Court of Claims.

July 20, 1967.

Franklin Jones, Marshall, Tex., and Kenneth G. Burgess, Shreveport, La., for plaintiffs, Franklin Jones, Marshall, Tex., attorney of record. Jones, Jones & Baldwin, Marshall, Tex., of counsel.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen., Carl Eardley, for defendant.

Before COWEN, Chief Judge, JONES, Senior Judge, LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on November 21, 1966. Exceptions to the commissioner's findings and recommended conclusion of law were filed by plaintiffs, defendant urged adoption of the commissioner's report, and the case has been submitted to the court on oral argument of counsel and briefs of the parties. Since the court is in agreement with the trial commissioner's opinion and recommendation, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and the petition is dismissed.

Commissioner White's opinion,* as modified by the court, is as follows:

In this case, Turnbull, Inc., and A. & H., Inc., two corporations that acted as co-venturers in the construction of build-

ings at the Longhorn Ordnance Works in Texas under a contract with the defendant, sue for $892,787.20 because it was necessary under an oral directive from personnel of the defendant to change the construction sequence provided for in the contract.[1] (For the sake of convenience, the two corporations, in their relationship as co-venturers, will usually be referred to hereafter in the opinion as "the prime contractor."[2])

The defendant has consistently conceded throughout the present action that the prime contractor is entitled to compensation for its extra costs growing out of the change in the construction sequence ordered by personnel of the defendant after the prime contractor had begun the performance of the contract at the Longhorn Ordnance Works. Hence, the controversy between the parties relates to the proper amount of such compensation.

The contract involved in the present case was entered into on May 26, 1954 between the prime contractor and a contracting officer of the Corps of Engineers, Department of the Army; it was numbered DA–34–066–eng–4150; and it provided for the payment of $2,480,479.76 to the prime contractor for the furnishing of all labor, equipment, and materials (with exceptions not pertinent to this litigation) and the performance of the work involved in the construction of buildings at the Longhorn Ordnance Works, located in Harrison County, Texas. (This contract will usually be referred to hereafter in the opinion as "the contract.")

---

\* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. It was actually H. R. Henderson & Company, Inc., that entered into the contract in question as a co-venturer with A. & H. Inc. Subsequently, H. R. Henderson & Company, Inc., was merged with J. Gordon Turnbull, Inc., to form the present corporation, Turnbull, Inc., which succeeded to all the rights and obligations of H. R. Henderson & Company, Inc.,

under the contract involved in the present litigation.

2. A separate claim submitted in this same case on behalf of A. & H., Inc., as the electrical subcontractor on the Longhorn Ordnance Works job was disposed of by the court's decision dated January 22, 1965 (H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228). The style of the present case was changed after the court's decision of January 22, 1965 was rendered.

The contract contained "Changes" and "Disputes" provisions similar to those customarily inserted in Government construction contracts administered by the Corps of Engineers.

A notice to proceed under the contract was given to the prime contractor by the defendant on June 11, 1954.

The original date for the completion of the contract was January 10, 1955. However, as a result of the issuance of 34 change orders by the contracting officer (not including the transaction that is involved in the present litigation), the time for the completion of the contract was extended to May 1, 1955. The change orders referred to in the preceding sentence required the performance of numerous items of work that were not required under the provisions of the original contract, and deleted some items of work that were required under the provisions of the original contract. These change orders provided for a total net increase of approximately $500,000 in the contract price.

Fairly soon after work was begun under the contract, a dispute arose between the prime contractor and personnel of the defendant with respect to whether, in connection with the erection of the buildings, the contract should be interpreted as providing that the walls and roofs would be constructed before the concrete floor slabs were placed, or as providing that the concrete floor slabs would be placed before the walls and roofs were constructed. The dispute grew out of a discrepancy between the drawings and the specifications that were attached to and formed part of the contract. The prime contractor argued that the first of the two interpretations previously mentioned was the correct one. This dispute was finally resolved by a representative of the contracting officer in favor of the "walls and roofs first" plan of construction for which the prime contractor had contended. The administrative decision was incorporated in a letter dated August 5, 1954 and addressed to the prime contractor.

Notwithstanding the administrative decision referred to in the preceding paragraph, a representative of the contracting officer on August 24, 1954 issued an oral directive to the prime contractor, requiring that the sequence of construction previously agreed upon be reversed and that the prime contractor adopt a plan of construction whereby the concrete floor slabs would be poured before the walls and roofs of the buildings were constructed. Thereafter, the prime contractor, under protest but with vigor, launched into and carried out a "floors first" method of construction. The work force was operated on a 2-shift, overtime basis to achieve progress.

Because of the disruption of the work sequence resulting from the oral directive of August 24, 1954, it was necessary for the prime contractor to reschedule the job and to take steps to have the prime contractor's suppliers reschedule their operations. These circumstances changed the contract work from a smooth operation to one where it was necessary for the prime contractor to proceed on a makeshift basis and switch from one place to another, building as far as it could on one structure and then transferring the work force to another structure and a different type of work. Such factors, coupled with the geographical size of the project and the necessity of "hedgehopping" from area to area with no well-established plan of operation, increased the cost of the job.

More than nine months after the contracting officer's representative required the prime contractor to reverse the construction sequence, the prime contractor on June 11, 1955 demanded that a change order be issued to compensate the prime contractor for losses allegedly resulting from the reversal in the construction sequence. The prime contractor asked for an adjustment upward of $474,243.89 in the contract price on the claim arising out of the change in the construction sequence and on another claim (which is not involved in the present litigation) based upon alleged delay by personnel of the defendant in approving certain shop drawings.

On September 15, 1955, the contracting officer denied the June 1955 claims of the prime contractor in their entirety.

On October 5, 1955, the prime contractor appealed to the Chief of Engineers from the contracting officer's action of September 15, 1955 in denying the claim based upon the change in the construction sequence. The prime contractor's appeal was referred to the Corps of Engineers Claims and Appeals Board (as the representative of the Chief of Engineers) for determination. The subsequent proceedings before the board were assigned the number 938.

After an extensive hearing was held in Dallas, Texas, commencing January 31, 1956, the Corps of Engineers Claims and Appeals Board rendered a decision in No. 938 on June 19, 1956. The board's decision, after making extended factual findings, contained the following conclusion and action:

> * * * [T]he changes in slab placement from the methods and sequence ordered in the letter of 5 August 1954 constitute a change in the contract. Any costs and delays suffered prior to 5 August 1954 are not compensable since they occurred before receipt of the decision under General Provision 2 and at the appellant's risk, and for the further reason that said decision was rendered within a reasonable time after presentation to the Government.
>
> The appeal is sustained and the claim remanded for a change order equitably modifying the consideration and time for performance accordingly, excluding costs and delays incurred by appellant prior to 5 August 1954.

No appeal was taken to the Secretary of the Army from the June 1956 decision of the Corps of Engineers Claims and Appeals Board in No. 938, and no attack is made in the present action on the correctness of that administrative decision.

After the board's decision in No. 938 was rendered, the prime contractor and the contracting officer attempted on several occasions to negotiate an agreement on the amount of the equitable adjustment due the prime contractor, but without success.

On November 24, 1956, the contracting officer rendered a decision allowing the prime contractor the sum of $27,233.76 and 14 days' additional time as an equitable adjustment pursuant to the prime contractor's claim, as remanded to the contracting officer by the Corps of Engineers Claims and Appeals Board's decision in No. 938.

The prime contractor appealed to the Corps of Engineers Claims and Appeals Board from the November 24, 1956 decision of the contracting officer. The subsequent proceedings before the board on this appeal were assigned the number 1170. After holding a hearing during the period January 29–February 6, 1957, the board rendered a decision in No. 1170 on July 25, 1958. The board determined that the prime contractor was entitled to an equitable adjustment that would increase the contract price by $44,991.61 and extend the completion date of the contract by 26 calendar days.

The prime contractor took an appeal to the Secretary of the Army from the July 1958 decision of the Corps of Engineers Claims and Appeals Board in No. 1170. The appeal was referred to the Armed Services Board of Contract Appeals (as the representative of the Secretary of the Army) for determination, and was docketed as ASBCA No. 5146. The Armed Services Board of Contract Appeals rendered its decision on June 9, 1960. The ASBCA's decision increased the monetary amount of the prime contractor's equitable adjustment from $44,-991.61 (as allowed by the Corps of Engineers Claims and Appeals Board) to $48,512.84.

The prime contractor's petition in the present action was filed on May 21, 1962.[3]

---

3. The petition asserting a claim on behalf of A. & H., Inc., as the electrical sub-   contractor had previously been filed on August 15, 1960.

The petition in the present action asserts that "the contract was reached by the defendant," and that the prime contractor was damaged as a result of the breach. Hence, it is necessary to consider whether the court is called upon here to adjudicate a breach of contract case, as now contended by the prime contractor, or to review an administrative determination for finality under the criteria prescribed in the first section of the Wunderlich Act (41 U.S.C. § 321).

As previously indicated, the prime contractor and a representative of the contracting officer mutually agreed that the contract drawings and specifications, as properly interpreted, provided that the walls and roofs of the buildings should be constructed before the concrete floor slabs were placed. Therefore, it would seem logical to conclude that when a representative of the contracting officer later directed the prime contractor orally on August 24, 1954 to follow the "floors first" plan of construction rather than the "walls and roofs first" plan of construction provided for in the contract drawings and specifications, this directive breached the contract. However, it is not necessary for the court to decide whether the directive of August 24, 1954 actually constituted a breach of contract, since the prime contractor did not treat the directive as a breach of contract.

In this connection, it should be noted that the change in the sequence of construction required by the oral directive of August 24, 1954 was a matter which the contracting officer could have accomplished in accordance with the provisions of the contract by means of a written change order.

The contract contained the standard type of "Changes" provision that is customarily included in Government construction contracts. It was general provision 3 and stated in part as follows:

The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. * *

General provision 6 of the contract ("Clause 6 hereof") covered the subject of "Disputes" and stated in part as follows:

Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the contractor at his address shown herein. Within 30 days from the receipt thereof, the contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after the receipt thereof by the contractor, he appeals in writing to the Secretary, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary may designate an individual, or individuals, other than the contracting officer, or a board as his authorized representative to determine appeals under this article. * * *

When a representative of the contracting officer on August 24, 1954 issued to the prime contractor an oral directive requiring that the prime con-

tractor adopt a plan of construction whereby the concrete floor slabs would be poured before the walls and roofs of the buildings were constructed, instead of following the "walls and roofs first" plan of construction provided for in the contract drawings and specifications, the directive involved a change "in the drawings and/or specifications of this contract and within the general scope thereof," as that phrase was used in the "Changes" provision of the contract. Although the directive was oral and not in the form of a written order, as contemplated by the "Changes" provision of the contract, it was certainly the prerogative of the prime contractor to treat the oral directive of August 24, 1954 as a constructive change order under the "Changes" provision of the contract and to demand that a written change order be issued retroactively to compensate the prime contractor for the extra costs incurred as a result of the reversal in the construction sequence. Kings Electronics Co., Inc. v. United States, 341 F.2d 632, 637–639, 169 Ct.Cl. 433, 441–443 (1965); The Jack Stone Co. v. United States, 344 F.2d 370, 376, 170 Ct.Ct. 281, 291–292 (1965); Gholson, Byars and Holmes Construction Co. v. United States, 351 F.2d 987, 994–996, 173 Ct.Cl. 374, 380–390 (1965). This is what the prime contractor did.

Accordingly, the contracting officer had jurisdiction to consider and determine the claim asserted by the prime contractor for an equitable adjustment under the "Changes" provision of the contract; and when the contracting officer and the prime contractor ultimately failed to agree upon the amount of the equitable adjustment to which the prime contractor was entitled, the dispute became one which, under the express language of the "Changes" provision of the contract, was to "be determined as provided in Clause 6 hereof," i. e., the "Disputes" provision of the contract.

This dispute regarding the amount of the equitable adjustment due the prime contractor was processed in accordance with the "Disputes" provision of the con-

tract through the Corps of Engineers Claims and Appeals Board (acting as the representative of the Chief of Engineers) and through the Armed Services Board of Contract Appeals (acting as the representative of the Secretary of the Army). The end result of these administrative proceedings under the "Disputes" provision of the contract was a determination by the Armed Services Board of Contract Appeals that the prime contractor was entitled to an equitable adjustment in the amount of $48,512.84 by virtue of the change in the construction sequence pursuant to the directive of August 24, 1954.

As the Armed Services Board of Contract Appeals had jurisdiction to grant complete relief to the prime contractor under the "Changes" and "Disputes" provisions of the contract, and as the ASBCA was dealing with a question of fact in determining the amount of the equitable adjustment due the prime contractor (United States v. Callahan Walker Co., 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942); F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 400, 131 Ct.Cl. 501, 512 (1955)), the determination by the ASBCA regarding the amount of the equitable adjustment to which the prime contractor was entitled must be accepted by the court as final and conclusive if that determination meets the criteria prescribed in the first section of the Wunderlich Act (41 U.S.C. § 321). Morrison-Knudsen Co., Inc. v. United States, 345 F.2d 833, 837, 170 Ct. Cl. 757, 763–764 (1965).

Under the first section of the Wunderlich Act, any determination by the head of a Government department (or his duly authorized representative) on a question of fact under the standard "Disputes" provision of a Government contract is final and conclusive unless such determination is not supported by substantial evidence, or is fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith. Therefore, consideration will be given first to the question of whether the determination of the Armed Services Board of Con-

tract Appeals regarding the amount of the equitable adjustment due the prime contractor is or is not supported by substantial evidence.

█ In determining the amount of the equitable adjustment due the prime contractor, the task of the Armed Services Board of Contract Appeals was to ascertain the extent to which the prime contractor's costs were increased over what they would have been if the construction sequence had not been changed pursuant to the August 24, 1954 directive. Hol-Gar Manufacturing Corp. v. United States, 360 F.2d 634, 638, 175 Ct.Cl. 518, 524 (1966). By agreement of the parties, the matter was presented to the ASBCA on the records that had been made before the Corps of Engineers Claims and Appeals Board in Nos. 938 and 1170, plus a considerable amount of supplemental evidence that was presented at a further hearing before the ASBCA. As previously indicated, the proceedings before the Corps of Engineers Claims and Appeals Board in No. 938 dealt primarily with the problem of whether the prime contractor was entitled to an equitable adjustment, and the proceedings in No. 1170 dealt primarily with the problem of the amount of the equitable adjustment that the prime contractor was entitled to receive. Hence, we are principally concerned at the present time with the record that was made in No. 1170.

The prime contractor contended at the hearing before the Corps of Engineers Claims and Appeals Board in No. 1170 that the equitable adjustment to which it was entitled should be measured by the difference between the prime contractor's bid price and the actual cost of performing the entire contract. The prime contractor offered a report prepared by an accounting firm (which the Corps of Engineers Claims and Appeals Board rejected, but which the Armed Services Board of Contract Appeals later admitted in evidence) tending to show that the difference between the prime contractor's bid price and the actual cost of performing the entire contract amounted to $774,-814.19, to which the prime contractor

proposed the addition of 10 percent for overhead and 10 percent for profit, or $162,710.98, thus making the prime contractor's total claim under this theory $937,525.17. The prime contractor presented oral testimony from John M. Henry, the prime contractor's project manager on the Longhorn Ordnance Works job, from Charles L. Ten Eyck, a structural engineer and vice president of James Stewart Company, general contractors, and from Hal C. Dyer, general contractor, that it was not feasible, in their respective opinions, to estimate in financial terms the effect on specific work items under the contract of the defendant's directive requiring the prime contractor to follow the "floors first" construction plan instead of the "walls and roofs first" construction plan.

The Government presented at the hearing in No. 1170 oral testimony from Harold L. Elliott, Chief of the Estimate Section, Tulsa District, Corps of Engineers, from John P. Koch, a civil engineer employed by the Corps of Engineers primarily to review estimates in the Southwestern Division, and from Grayson Gill, an architect-engineer, that it was feasible, in their respective opinions, to estimate in financial terms the effect of the August 24, 1954 directive upon specific items of work involved in the contract. Mr. Elliott testified about an estimate that he had made based upon a consideration of 12 separate items of work affected by the defendant's directive of August 24, 1954, and he concluded that the directive had increased the prime contractor's over-all costs to the extent of $27,233.77. Mr. Koch had also made an estimate based upon a consideration of the same work items that Mr. Elliott used, and Mr. Koch concluded that the August 24, 1954 directive had increased the prime contractor's over-all costs to the extent of $31,576. Mr. Gill had made an estimate based upon a consideration of 14 separate work items affected by the directive of August 24, 1954, and he concluded that the directive had increased the prime contractor's over-all costs to the extent of $58,645.75. In addition,

Government counsel elicted from John M. Henry, the prime contractor's project manager, on cross-examination that he estimated the prime contractor's over-all extra costs attributable to the directive of August 24, 1954 as totaling $87,618, in relation to 14 different items of work affected by the directive.

In its decision of July 25, 1958 in No. 1170, the Corps of Engineers Claims and Appeals Board carefully analyzed the evidence that had been presented to it and determined, upon the basis of the several witnesses' estimates as to increased costs, that the prime contractor was entitled to an equitable adjustment that would increase the contract price by $44,991.61 and extend the completion date by 26 calendar days.

As previously indicated, the Armed Services Board of Contract Appeals not only had presented to it the records previously made before the Corps of Engineers Claims and Appeals Board in Nos. 938 and 1170, but the ASCBA supplemented those records by receiving additional evidence. Among the witnesses appearing before the ASCBA at the supplemental hearing was John M. Henry, the prime contractor's project manager, whose testimony before the ASBCA included an upward revision, from $87,618 to $223,138.97, of Mr. Henry's estimate regarding the over-all amount of the prime contractor's extra costs resulting from the directive of August 24, 1954, in relation to different work items affected by the directive.

In its decision of June 9, 1960 (ASBCA No. 5146), the Armed Services Board of Contract Appeals affirmed the determination of the Corps of Engineers Claims and Appeals Board in No. 1170 regarding the extent to which the prime contractor's costs of performing various items of work had been increased (or decreased) as a result of the August 24, 1954 directive, except that the ASBCA revised the amount for one item upward from $2,753.54 to $5,846.41 and made corresponding upward revisions in the overhead and profit figures. As a consequence of these revisions, the ASBCA increased the total amount of the upward adjustment in the contract price from $44,991.61 (as allowed by the Corps of Engineers Claims and Appeals Board) to $48,512.84.

■ In deciding whether the determination of the Armed Services Board of Contract Appeals that the prime contractor was entitled to an equitable adjustment in the amount of $48,512.84 is supported by substantial evidence, the test is whether such determination is supported by evidence in the administrative record that might convince a reasonable person. T. C. Bateson Construction Co. v. United States, 149 Ct.Cl. 514, 518 (1960); River Construction Corp. v. United States, 159 Ct.Cl. 254, 261 (1962); Camero v. United States, 345 F.2d 798, 800, 170 Ct.Cl. 490, 493–494 (1965). The administrative determination is not to be tested by the standard of whether the court would reach the same conclusion upon an independent study of the evidence in the record.

■■ As indicated previously in this opinion, the ASBCA's determination of the amount of the equitable adjustment due the prime contractor was based upon estimates—i. e., opinions—of persons experienced in the construction industry relative to the effect of the August 24, 1954 directive on the costs of performing various items of work under the contract. The opinions of competent persons constitute evidence for the purpose of applying the substantial evidence rule. Bristol-Myers Co. v. Federal Trade Commission, 185 F.2d 58, 62 (4th Cir. 1950). Accordingly, it must be concluded that the ASBCA's determination of $48,512.-84 as representing the amount of the equitable adjustment due the prime contractor is supported by substantial evidence, i. e., by evidence in the record that might convince a reasonable person.

Furthermore, there is nothing to indicate that such determination was fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith.

As noted previously, the prime contractor contended before the administrative agency—and the prime contractor makes the same contention before the court—that the amount of its equitable adjustment should be measured by the difference between its bid price and the actual cost of performing the entire contract. Plaintiff has relied throughout on this "total cost" method of computing recovery and has not sought to prove increased costs or damages relating to specific or separate items.[4]

This court has said that the "total cost" theory of computing the amount due a contractor under a cause of action against the Government "is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff's bid was accurately computed, which is not always the case, by any means"; and that it is not to be used "except in an extreme case" where there is a "lack of other proof." F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 400, 131 Ct.Cl. 501, 511 (1955). This method of computation has been held by the court to be justified in a situation where there was no alternative (Oliver-Finnie Co. v. United States, 279 F.2d 498, 506, 150 Ct. Cl. 189, 200 (1960)), or where it was the only possible method of determining the amount due the contractor (J. D. Hedin Construction Co. v. United States, 347 F.2d 235, 247, 171 Ct.Cl. 70, 87 (1965)).

In this case, the court has before it an administrative determination regarding the amount of the equitable adjustment due the prime contractor, based upon estimates made by persons experienced in the construction industry concerning the extent to which the prime contractor's costs in performing various items of work were increased over what they would have been if the construction se-

quence on the Longhorn Ordnance Works job had not been changed pursuant to the August 24, 1954 directive. As previously mentioned, these estimates might convince a reasonable person and, therefore, they constitute substantial evidence supporting the administrative determination. Consequently, this is not an extreme case where the "total cost" theory represents the only possible method of computing the amount of the equitable adjustment due the prime contractor.

For the reasons previously stated, the ASBCA's determination of $48,512.84 as the amount of the equitable adjustment due the prime contractor is final and conclusive under the first section of the Wunderlich Act (41 U.S.C. § 321), without regard to whether the court would reach the same conclusion upon an independent study of the evidence in the administrative record.

Moreover, if the court were to consider plaintiff's suit as a suit for breach of contract, not redressable under the contract, the result would have to be the same. Under United States v. Utah Construction and Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), the court is bound by these administrative findings in a suit for breach, and must therefore find that plaintiff has not proved any damages beyond those found by the boards. Plaintiff has not timely sought in this court to present any further evidence on damages and the court is therefore limited to the evidence presented administratively. On that record, the board's findings as to the scope of damage must be sustained.

As it appears that the sum of $48,512.-84 which the Armed Services Board of Contract Appeals allowed the prime contractor as an equitable adjustment was subsequently paid to the prime contractor by the defendant, the prime contractor is not entitled to any further recovery in the present action, and the petition should be dismissed.

---

4. In this respect, the present case differs from the case of A. & H., Inc., the electrical subcontractor (169 Ct.Cl. 228 (1965), see note 2, supra), in which there was proof of increased costs as to specific items. That subcontractor, unlike the prime contractor here, did not rest solely upon the "total cost" theory.