**MERRITT–CHAPMAN & SCOTT CORPORATION**

v.

**The UNITED STATES.**

**No. 69–62.**

United States Court of Claims.

Jan. 21, 1966.

James J. A. Gallagher, New York City, attorney of record, for plaintiff. Shea, Gallop, Climenko & Gould, New York City, of counsel.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

This case was referred pursuant to Rule 57(a) to Trial Commissioner Richard Arens, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed October 13, 1964, stating that the only evidence before the court is the administrative record and that the parties have filed statements in the nature of assignments of errors allegedly committed by the Board of Contract Appeals. The plaintiff has excepted to the opinion and recommendation of the trial commissioner and defendant has stated that it accepts them without modification or exception. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Such facts as are necessary to decision of the case are found in the commissioner's opinion and report.

Since the court is in agreement with the opinion and recommendation for conclusion of law of the trial commissioner, with minor deletions, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER

Plaintiff was awarded a contract by the First District, United States Navy, to provide and secure the installation of an aviation gas and jet fuel storage and distribution system, complete and ready for use at the Melville Fuel Facility, United States Naval Supply Depot, Newport, Rhode Island, for the lump-sum contract price of $1,195,714.

Plaintiff makes two claims arising out of the contract, which were the subject of decision adverse to plaintiff by the contracting officer. Thereafter, upon timely appeal, the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals, in a written opinion, denied plaintiff's appeal. The only evidence before the court is the administrative record which was received in evidence in a pretrial conference, following which plaintiff filed a detailed statement in the nature of an assignment of errors allegedly committed by the Panel. A responding statement was filed by defendant. The amount of recovery, if any, is reserved for further proceedings.

There is no significant difference between the parties regarding the facts out of which the claims arise.

The contract provided that plaintiff was to excavate a certain area and install the foundation slabs for large fuel and storage tanks "A" and "B" which, according to the notice to bid, "will be furnished and erected by the Government * * *." Plaintiff was to install certain drainage and filtered material, and to perform certain pumping operations while the construction was in progress. After the erection of the tanks, plaintiff was to place reinforced concrete slabs on top of the tanks, provide concrete and piping facilities, and then backfill the area of construction.

On April 12, 1952, the Fifth District, United States Navy, entered into a separate prime contract with the Hammond Iron Works for the fabrication and erection of the tanks. The completion date of the Hammond Iron Works contract was originally November 17, 1952, but was later extended by change order for 346 days.

On June 26, 1952, plaintiff was awarded its contract and was given notice to proceed. The completion date of plaintiff's contract was 350 calendar days after notice to proceed, but this time

was later extended by change order until May 10, 1955, as a result of excusable delays and changes.

On or about September 4, 1952, defendant approved a progress schedule which plaintiff had been requested by defendant to submit. The schedule was based on contemplation of delivery by September 15, 1952, of certain structural steel and anchors, to be imbedded in the concrete, and to be supplied by the tank manufacturers. The schedule further provided for completion of the tank erection in December 1952.

In October 1952, while plaintiff was engaged in the excavation phase of its work, defendant's resident officer in charge transmitted to plaintiff a letter which he had received from the Hammond Iron Works, stating that because of a steel strike, its supplier of steel could not supply certain of the steel until November 29, 1952. Accordingly, plaintiff slowed down the excavation phase of its work which it completed in November 1952.

Early in December 1952, plaintiff placed filter and drainage materials under the bottoms of tanks A and B, as well as around the underdrains of both tanks (surrounding the perimeter of the tanks and roughly 6 to 7 feet above the bottom of the tanks). The filter and drainage materials, as thus placed, met the gradation requirements of sections 2–08 and 2–09 of the specifications. Plaintiff then proceeded with the placing of reinforcing steel for the concrete foundations. In the latter part of December 1952, defendant directed plaintiff to make changes in the location of sump pits and in the location of slopes for the bottom of the tanks.

Because of the impracticability of performing outside work during the winter weather, plaintiff, without defendant's direction, approval or disapproval, stopped work from mid-January 1953 to mid-March 1953. Upon resumption of work, tests were made at the instance of defendant which showed that the foundation filter and drainage materials had become contaminated as a result of excessive rainfall which had carried silt and debris into the materials and caused them to fail to conform to the gradation requirements of the specifications. Whereupon, defendant directed plaintiff to replace the filter and drainage materials in the foundation area of tank A with materials conforming to the gradation requirements of the specifications, and to clean and wash the comparable materials in the area of tank B.

Plaintiff performed as directed, but under protest. Although prior to the winter layoff plaintiff had placed the filter and drainage materials under the bottoms of the tanks, it contended that the contract documents required filter and drainage materials to be placed only around the underdrains and not under the bottoms of the tanks. Accordingly, plaintiff asserted to defendant and now alleges, as its first claim, that defendant's direction for the remedial work constituted a change in the contract and that plaintiff is entitled to be compensated for the extra work.

The question presented in this claim, namely, interpretation of the contract documents, is a question of law; hence, it is to be resolved independently by the court even though the sole record before the court is the administrative record. Beacon Construction Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963); WPC Enterprises, Incorporated v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963); Wingate Construction Co. v. United States, 164 Ct.Cl. 131 (1964).

We come then to an examination of the provisions of the contract documents which are pertinent to the locations of the filter and drainage materials.

In addition to the usual articles providing for performance, changes, and disputes, the contract required plaintiff to be responsible for all materials delivered and work performed until completion and final acceptance.

Article 5(a) provided:

*Conflicts — Omissions — Misdescription — Misinformation. —* The Contractor shall keep on the work a copy of the drawings and specifications and the Officer in Charge shall at all times have access thereto. Anything mentioned in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between the drawings and specifications the specifications shall govern. Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

Pertinent provisions of the specifications were:

2–08. *Drainage material.* (Selected Material Type A) shall be placed around the underdrain surrounding the fuel tanks as shown on the plans. The material shall consist of wellgraded gravel made up of hard, durable stone and coarse sand free from organic matter, loam and clay. The grading shall conform to the following gradation: * * *

2–09. *Filter material.* (Selected Material Type B) shall be placed around the underdrain surrounding the fuel tanks as shown on the plans. The material shall consist of wellgraded, bulky mineral grains, and shall conform to the following gradation: * * *

The drawings which accompanied the specifications showed arrows depicting the location of the filter and drainage materials. The arrows travel down the sides of the tank and turn under the bottom of each side of the tank.

The issue on plaintiff's first claim is simply whether the contract documents required the filter and drainage materials to be installed under the bottoms of the tanks.

If sections 2–08 and 2–09 of the specifications were standing alone, without regard to the drawings, there would be no question but that the filter and drainage materials were to be installed only "around the underdrain" which, as heretofore noted, was several feet above the bottom of the tank. The specifications further provide, however, that the materials shall be placed "as shown on the plans" which clearly depict the materials under the bottom of each tank. At this point, we refer to the above-quoted Article 5(a) of the contract as an aid to the proper resolution of the variance between the specifications and the drawings. Plaintiff lays emphasis on that part of the language of Article 5(a) which provides that, in case of difference between the drawings and specifications, the specifications govern. Plaintiff, in essence, contends that since the specifications do not provide for the materials to be installed under the bottoms of the tanks, plaintiff was not required to do so, even though the drawings did show the arrows depicting the materials under the bottoms of the tanks. At least, plaintiff asserts, the contract documents were ambiguous and, since they were prepared by defendant, plaintiff is entitled to give them a reasonable construction, which, in this instance, plaintiff now alleges is that the materials were not required to be installed under the bottoms of the tanks.

The facts are, however, that plaintiff initially did interpret the contract documents as requiring the materials to be installed under the bottoms of the tanks and did so install them. It was only after the materials had become contaminated with silt and debris that plaintiff gave the contract documents the interpretation for which it now contends. Furthermore, a fair reading of all of Article

5(a), together with the specifications and the drawings, compels the conclusion that the plaintiff's first interpretation was correct.

■ Article 5(a) provides that anything mentioned in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. The specifications did not mention the installation of the materials under the bottoms of the tanks, but made direct reference to the drawings which did depict the material under the bottoms of the tanks. In light of the testimony before the Panel, it is concluded, moreover, that the variance between the specifications and the drawings was an "omission" and not a "difference" as those words are used in Article 5(a); hence, it cannot be said that the language of the specifications can stand alone in determining the scope of the work to be performed. It follows that plaintiff's first claim must be denied.

We come then to plaintiff's second claim, which in essence, is that because of the delay of the Hammond Iron Works in the erection of the tanks, plaintiff incurred pumping costs in excess of the pumping costs which it reasonably estimated when it computed its bid, and that, as a result, the scope of its contract work was enlarged and it is entitled to additional compensation.

Section 2–04 of the specifications reads:

2–04. *Shoring and bracing.*—Excavations shall be sheathed and shored where necessary to prevent danger to persons or adjacent structures, injurious caving or erosion. Shoring, bracing and sheathing shall be removed as the excations are backfilled. Excavations shall be kept free from water while construction therein is in progress. All pumping shall be at the contractor's expense. This contractor shall also be responsible for keeping the excavations free from water while erection of tank steel is in progress.

In arriving at its estimate of costs upon which to make its bid, plaintiff estimated that the tanks would be erected in 2-months time. As heretofore indicated, due to strikes in the steel industry, the Hammond Iron Works was delayed and required approximately 6 months to erect the tanks. Consequently, plaintiff performed pumping operations for a period of time in excess of the estimated time.

The Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals held that the circumstance that plaintiff pumped water from the excavations for a period of time in excess of what it anticipated or estimated at the time it computed its bid price for the job, did not effect a change in the specifications for which plaintiff would be entitled under the changes article to extra compensation. The Panel further held that, despite the assertions of plaintiff's attorney to the contrary, its claim was for damages for delays, but that, since plaintiff specifically disavowed delay damage as a basis for the claim, the issue was not before the Panel.

Irrespective of whether plaintiff's second claim is considered as one for compensation for alleged extra work under the changes article of the contract, or as one for damages for breach of contract, the crucial question to be decided is a question of law, namely, the meaning and effect of the language of the above-quoted section 2–04 of the specifications. Accordingly, this court would, under the authority of the cases previously cited, make its own determination independently of the action of the administrative agency.

■■ It is clear that the specifications required that the excavations be kept free from water while the construction and erection of the tanks were in progress and that all pumping was at plaintiff's expense. The language of the specifications obviously does not specify a terminal date for the pumping operations. For how long then did plain-

tiff obligate itself to continue the pumping—2 months, 6 months, 1 year, 5 years, 10 years—so long as the construction was in progress? Certainly the parties did not contemplate that the language of the specifications would be given a literal interpretation in defiance of reasonable expectations. On the other hand, a contractor who bids in response to a Government notice to bid for a construction contract such as involved here must be presumed to take into account the many factors which might well affect the time of performance by another contractor on whom the bidder may be dependent. Where there is no provision in a contract for the time for performance, a reasonable time is implied. Van Stone v. Stillwell & Bierce Manufacturing Co., 142 U.S. 128, 12 S.Ct. 181, 35 L.Ed. 961 (1891); Minneapolis Gas Light Company v. Kerr Murray Manufacturing Co., 122 U.S. 300, 7 S.Ct. 1187, 30 L.Ed. 1190 (1887).

Under the facts and circumstances of this case, and in light of the obligation which plaintiff undertook, as set forth in the specifications, it cannot be said that plaintiff was required to perform the pumping operations for an unreasonable time even though plaintiff did initially contemplate that a lesser time would be required.

Defendant did not warrant that the construction would be completed by any specific date. Moreover, the delay of the Hammond Iron Works was occasioned by strikes in the steel industry, for which defendant was in no way at fault. See Gilbane Building Co. v. United States, 333 F.2d 867, 166 Ct.Cl. 347 (1964); Stafford v. United States, 74 F.Supp. 155, 109 Ct.Cl. 479 (1947); Irwin & Leighton v. United States, 101 Ct.Cl. 455 (1944).

Plaintiff's second claim must accordingly also be denied.

## CONCLUSION OF LAW

Upon the foregoing opinion, which includes therein the findings of fact made by the court based on the administrative record as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and, therefore, its petition is dismissed.