Per Curiam:
This case was referred to Trial Commissioner Richard Arens with directions to make his recommendation for conclusions of law on plaintiff’s motion and defendant’s cross-motion for summary judgment under Rule 54(b). The commissioner has done so in an opinion and report filed on September 18, 1967. Plaintiff filed a request for review of the commissioner’s recommendations on November 17, 1967, and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.
*304 Since this is a Capehart Act contract, the question arises whether the Armed Services Board of Contract Appeals had jurisdiction of the various claims. See Len Company v. United States, 181 Ct. Cl. 29, 385 F. 2d 438 (1967). Claim 1 (“Off-site Drainage”) concerns a changed condition under the “Changed Conditions” clause and was therefore within the Board’s jurisdiction. Kesk, Inc. v. United States, No. 219-63, order dated February 2, 1968. Claim 2 (“Core Compaction”) involves no more than a disputed legal issue and, accordingly, it makes no difference whether or not the ASBCA had jurisdiction. Claim 3 (“Borrow Material”) may or may not arise under the contract, but the parties have so treated the claim throughout; plaintiff agrees that it is bound by the administrative record, and it seeks no de novo trial. We therefore treat the count in this case as arising under the contract.
On the merits, Claim 1 is governed by the general rule recently announced in Chris Berg, Inc. v. United States, 182 Ct. Cl. 23, 389 F. 2d 401 (1968).
The court agrees with the commissioner’s recommendation and with his opinion, with minor modifications. It therefore adopts the commissioner’s recommendation and opinion, as modified, as hereinafter set forth together with the preceding paragraphs as the basis for its judgment. Therefore, defendant’s motion for summary judgment is granted, plaintiff’s motion for summary judgment is denied and plaintiff’s petition is dismissed.
Commissioner Arens’ opinion as modified by the court is as follows:
This case, which is before the court on cross-motions for summary judgment, involves three claims arising out of a contract entered into on July 27, 1959, by plaintiff with the Department of the Army for the construction under the Capehart Act[1] of 349 housing units at Fort Sill, Oklahoma. On May 9, 1961, the contracting officer denied plaintiff’s request for equitable adjustments on the three claims pre *305 sented herein, and, npon appeal, the Armed Services Board of Contract Appeals, after extensive hearings, denied the appeal, except as hereinafter noted with respect to Claim 3.[2] Plaintiff challenges the ASBCA decision as being arbitrary and capricious, not supported by substantial evidence, and as being erroneous as a matter of law in designated particulars.

Olaim 1. Off-site Drainage.

Plaintiff admitted that it had the responsibility under the contract for drainage of the site area, but asserted before the ASBCA that it was the understanding of the parties that storm sewers which were to be installed by an off-site contractor were to be available for use by plaintiff for drainage of the site area; but that as a result of various extensions in completion time for the off-site contractor (due primarily to weather and changes in sewer alignment) plaintiff was required to work under flooded and muddy conditions which resulted in increased costs; and that the absence of the off-site drainage facilities constituted a changed condition.
In denying the appeal on plaintiff’s Claim 1, the ASBCA stated:
To establish the existence of an understanding that the off-site drainage system would be available for use appellant relies on (1) contract provisions; and (0) oral commitments made to the appellant by Government agents.
The contract provisions relied on consist of: (1) Article XVII of the housing contract which states, “The Department shall provide those improvements and utilities which are designated in the Drawings and Specifications to be furnished by others * * (2) Technical specifications in the housing contract requiring appellant to connect the on-site sewer system to the off-site sewer system. (3) The time requirements in the off-site contract which required completion of the Fort Sill Boulevard contract within 75 days. (4) Technical specifications in the housing contract which required appellant to drain during construction the on-site area and 25 feet adjoining.
*306 The contract provisions encompassed by (1) and (2) above, show the interrelationship of the on-site and off-site work. But they contain no indication as to when the off-site work is to be done and no representations that the off-site work will be ready for appellant’s use by a certain date. The Government points out that there are expressions in the coordination clauses of the contract such as, “if the work in the adjacent area has not been performed” and “if the adjacent work has been completed.” Article XVII, referred to above, also provides in part that the contracting officer shall not delay final inspection and recommendation of acceptance because of non-completion of improvements and utilities to be furnished by others. This language negatives any implication that the off-site work had to be completed when appellant was ready to connect with it. But if a provision that appellant was to connect its sewer system with the off-site system could possibly be construed as a commitment that the off-site system would be available for connection, it does not mean that the off-site system would be ready before the on-site system was constructed. Insofar as we can determine from the record the Fort Sill Boulevard sewer was ready for connection before the on-site system in that area was completed.
The provisions covered by (3) above, concern the time schedule in the off-site contract. The off-site contractor agreed to complete various portions of the sewer system by certain dates. It was not a commitment by the Government to the off-site contractor, much less to the on-site contractor. There is no reference to the off-site time schedule in the housing contract.
The provisions covered by (4) above, impose an obligation on the on-site contractor to drain the area during construction. They place no obligation on the Government except the implied one not to interfere with the contractor’s contractual commitment. It is not shown that the Government did anything to interfere with appellant draining the housing site.
It is clear that the foregoing interpretation of the contract provisions is correct and supports the conclusion reached by the ASBGA that the Government did not commit itself contractually to have the off-site sewer system ready when plaintiff commenced on-site work. National Concrete and Foundation Co. v. United States, 170 Ct. Cl. 470 (1965); Lenry, Inc. and William P. Bergan, Inc. v. United States, *307 156 Ct. Cl. 46, 297 F. 2d 550 (1962); Gilbane Bldg. Co. v. United States, 166 Ct. Cl. 347, 333 F. 2d 867 (1964).
In its opinion tbe ASBCA also discussed the testimony regarding the oral commitments allegedly made to plaintiff by Government agents that the off-site sewers would be ready for drainage and concluded that the evidence failed to establish such commitments. The ASBCA noted that the “Government personnel involved flatly denied making any promises.” The ASBCA conclusion is amply supported by the record.
In this court plaintiff contends that the foregoing findings of the ASBCA are irrelevant because “plaintiff’s claim for an equitable adjustment is not based upon defendant’s ‘fault’; it is premised upon the simple fact that conditions were not as the parties expected — a situation clearly within the purview of the changed conditions provision of the contract.” Plaintiff relies upon the following language in the second half of the operative language of the changed conditions article:
* * * previously unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this-Housing Contract which physical conditions either were-not, or m the exercise of the care required by other provisions of this contract would not have been, discovered by the eligible builder. * * *
Plaintiff misapprehends the scope of the foregoing language which, the decided cases teach, does not apply to the factual situation posed by the instant case. In considering this language, the court, in Perini Corp. v. United States, 180 Ct. Cl. 768, 381 F. 2d 403 (1967), pointed out that to qualify as a changed condition, the unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience, if any, as a contractor in the area.[3] In the instant case, plaintiff, an experienced contractor, knew or should have known of the *308 probabilities of delay in the off-site construction. In Merritt-Chapman & Scott Corp. v. United States, 174 Ct. Cl. 250, 355 F. 2d 622 (1966), the plaintiff contended that it was entitled to compensation under the changes article because it was required to pump water from excavations for a period of time in excess of what it anticipated. The additional pumping was occasioned by the fact that another contractor, upon whom the plaintiff was dependent, was delayed by a strike. In denying the claim, this court pointed out that a contractor who bids in response to a Government notice to bid for a construction contract must be presumed to take into account the many factors which might well affect the time of performance by another contractor on whom the bidder may be dependent.
John A. Johnson Contracting Corp. v. United States, 132 Ct. Cl. 645, 132 F. Supp. 698 (1955), cited by plaintiff is inapposite. In that case certain roads which were constructed by another contractor and which the plaintiff expected to use in hauling materials, disintegrated because of soil conditions which were unknown and of an unusual nature. The court concluded that conditions unforeseen by the parties to the contract were encountered. It is clear that the facts in that case and in the instant case differ materially and that in the instant case plaintiff did not encounter “unknown physical conditions at the site of an unusual nature,” even though plaintiff may have expected that the off-site drainage system would be available during construction.
Plaintiff argues further in this court that defendant breached the contract by issuing to plaintiff the notice to proceed at a time when the site was not ready “because there was no way to accomplish the required drainage” and that defendant should have waited until the off-site facilities were completed before issuing the notice. It appears that having obtained an administrative decision under the contract, plaintiff is in no position now to assert a breach claim which seeks no further or different relief.[4] If, however, there is a separate breach claim, we are bound by the Board’s findings (United States v. Utah Constr. Co., 384 U.S. 394 (1966)) and to the *309 extent that the Board made no determination of an issue, we can make our own finding on the administrative record. In that connection, we believe that the evidence establishes that plaintiff could have effectively solved its drainage problem by constructing at moderate expense a system of ditches without reliance on the off-site sewers. There is a long line of cases, moreover, which lay down the rule that in the absence of an express warranty, or its own fault, the Government is not liable for failing to make the work site available to a contractor at a specified time due to delays experienced by another independent contractor. United States v. Rice, 317 U.S. 61 (1942) ; United States v. Howard P. Foley Co., 329 U.S. 64 (1946) ; Gilbane Bldg. Co. v. United States, supra. In the instant case, defendant gave no warranty that the off-site drainage would be available at any certain time, nor was the delay in providing off-site drainage attributable to any fault on its part. Plaintiff’s Claim 1 must be denied.

Olaim, £. Gore Compaction.

Paragraph 34-05 of the specifications provided, in part, as follows:
34-05. EXCAVATION: * * * The existing soils in the N.C.O. housing area are not suitable as foundation soils underlying the house slabs. These existing soils shall be excavated and removed to a grade 18 inches below and clear of the underside of the slabs and the beams, and replaced with compacted “select” fill or borrow * * *.
Paragraph 34 — 14.a of the specifications provided, in part, as follows:
34-14. COMPACTION
a. Over-All or Over-Lot Areas. Each layer of all fills and embankments, including fills under sidewalks and building slabs, shall be compacted by rolling with the rolling equipment specified herein, or combination thereof, to at least 90 percent of maximum density at optimum moisture content * * .
The dispute arose over the facts which were expressed by the ASBCA as'follows:
Since beams extended 30 inches beneath the surface and slabs 4 inches beneath the surface, excavation was re *310 quired to a grade 48 inches beneath the surface for beams and 22 inches beneath the surface for slabs. This would leave an unexcavated portion or “core” in the form of a step 26 inches in the excavation. For reasons of economy appellant proposed to remove the entire area to a depth of 48 inches.
‡ ‡ ‡ # *
Appellant proposed to replace and compact to 90% density only the 18 inches beneath slabs and beams which it was required by the contract to remove. As to the additional 26 inch “core” which it had removed it proposed to replace it only at “natural ground density.” This latter expression was not explained but since appellant states that it “could have been attained by the hauling equipment without resorting to rolling,” appellant apparently proposed merely to fill the excavated “core” area with lose borrow with little compaction. The Government required that appellant compact the additional 26 inch “core” to 90% density.
It is plaintiff’s position that defendant’s requirement that it compact to 90 percent of maximum density the core under the slabs constituted a constructive change, entitling plaintiff to an equitable adjustment. The ASBCA ruled that plaintiff was required to remove only 18 inches below the slabs and that when it went deeper and overexcavated, the entire excavated area became a fill area within paragraph 3A-14.a of the specifications, and hence plaintiff was required to do no more than was called for by the specifications.
Although the issue to be decided turns on a proper interpretation of the contract specifications and is therefore a question of law which this court is free to answer independently of the Board’s decision,[5] it is concluded that the decision of the ASBCA is correct. There is no question but that plaintiff excavated to a greater depth than required by the specifications and that it did so purely for its own convenience. After the excavation, the entire excavated area clearly became a fill area within the meaning of the specifications. It is concluded that there is no such uncertainty regarding the meaning of the specification as to form the proper basis for any other construction. Southern Constr. Co. *311 v. United States, 176 Ct. Cl. 1339, 364 F. 2d 439 (1966); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 351 F. 2d 972 (1965). Defendant was therefore entitled to require that plaintiff compact the additional 26-inch core to 90 percent of density and plaintiff is not entitled to recover an additional amount therefor.

Claim, §. Borrow Material.

The specifications provided that material required for fills in excess of that produced by normal grading operations was to be excavated from the borrow areas indicated on the Government furnished contract drawings, and that the compacted fill not exceed a liquid limit of 35.[6] Plaintiff asserted before the ASBCA that part of the material in Borrow Area No. 1 was of such quality and degree of moisture content that compaction to 90 percent of maximum density, a contract requirement, could be achieved only by 12 or more passes of a roller instead of an expected 3 or 4, and that there was an abnormal shrinkage in the material, necessitating the hauling of additional amounts. The drawings showed bor-ings down to Sy2 or 4 feet within Borrow Area No. 1 and revealed that in most instances the maximum allowable liquid limit was reached at the 3%-foot level. At the hearing before the ASBCA, defendant introduced evidence to show that there was an adequate supply of satisfactory borrow material above the S^-foot level to satisfy plaintiff’s needs. The evidence established, moreover, and the ASBCA found that plaintiff’s compaction efforts exceeded the average which should have been necessary and that this was due to excessive moisture in the borrow fill.
The pivotal issue which the ASBCA then considered was the cause of the high moisture content. After appraising the testimony of plaintiff’s and defendant’s witnesses, the ASBCA found that (1) the high moisture content of some of the borrow fill was due to the fact that plaintiff excavated it from levels substantially below 3% feet, which was the *312 limit of tbe Government borings (and Government representations) and (2) the high moisture content of some of the borrow fill was due to heavy rainfall which occurred after October 29, 1959, and for which defendant was not responsible. The ASBCA found, however, that there was a relatively dry period between October 17 and 29, 1959, during which plaintiff’s excavations were from the upper levels-, of Borrow Area No. 1 and that the borrow material obtained during this period should have been suitable for compaction with an average amount of effort. The ASBCA accordingly sustained plaintiff’s claim only insofar as it related to this-period.
In challenging the findings of the ASBCA on Claim 3, plaintiff lays emphasis upon the testimony of its witnesses and attempts to minimize the effect of the testimony of defendant’s witnesses. There were varying degrees of conflict-in the testimony of plaintiff’s and defendant’s witnesses respecting the amount of borrow fill available and excavated at certain times and levels, its condition and the cause of its condition. There was also some variation in the total evidence respecting the period and intensity of the heavy rainfall but a fair reading of the entire record in the case compels the conclusion that these findings of -the ASBCA are supported by substantial evidence and therefore must be sustained. Turnbull, Inc. v. United States, 180 Ct. Cl. 1010 (1967).
Accordingly, defendant’s motion for summary judgment is granted, plaintiff’s motion for summary judgment is denied,, and plaintiff’s petition is dismissed.

 42 U.S.C. §§ 1594-1594j; 12 U.S.C. §§ 1748-17481. For a brief explanation of tbe procedures under the Capehart Act, see Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, cert. denied, 375 U.S. 879 (1963).

 ASBCA No. 7482 dated September 12, 1963.

 See also: Leal v. United States, 149 Ct. Cl. 451, 276 F. 2d 378 (1960) ; General Cas. Co. v. United States, 130 Ct. Cl. 520, 127 F. Supp. 805, cert. denied 349 U.S. 938 (1955).

 Morrison-Knudsen Co. v. United States, 170 Ct. Cl. 757, 345 F. 2d 833 (1965).

 Perini Corp. v. United State, supra.

 The liquid limit is the moisture content at which a soil passes from a semisolid to a liquid state. The specifications also .provided that the material used in fills meet another requirement which was subsequently waived by defendant.