**WOODCREST CONSTRUCTION COMPANY, Inc. and the Home Indemnity Company, as Completing Surety**

**v.**

**The UNITED STATES.**

**No. 32–67.**

United States Court of Claims.

March 14, 1969.

Albert Foreman, New York City, attorney of record, for plaintiffs. M. Carl Levine, Morgulas & Foreman, New York City, of counsel.

Douglas M. Smith, with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. H. Thomas Greene, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.*

The contract herein was basically a unit price contract for the construction of modifications and additions to the Central Control Building and the Telephone Exchange Building at the Cape Canaveral (now Cape Kennedy) Missile Test Annex at Patrick Air Force Base, Florida. After a number of contract modifications and time extensions, Woodcrest's contract was terminated for default, and the Home Indemnity Company, Woodcrest's surety, completed the job. Because of alleged late completions, the contracting officer withheld specified liquidated damages from Woodcrest's and Home Indemnity's progress payments.

Plaintiffs have four separate causes of action. The determinations of the contracting officer were appealed to the Corps of Engineers Board of Contract Appeals, which rendered a decision affirming the contracting officer's findings. This decision was appealed to the Board of Contract Appeals, but that Board dismissed the appeal on the ground that the appeal to the Corps of Engineers Board of Contract Appeals was the last administrative appeal authorized under the contract. Thus, plaintiff is here attacking the decision of the Corps of Engineers Board of Contract Appeals as not supported by substantial evidence. Since there are several causes of action, we will discuss each one separately.

### I—"Changed Conditions" Claim

■ On July 15, 1966, the Corps of Engineers Board of Contract Appeals (hereinafter referred to as the BCA) denied Woodcrest's appeal on the "Changed Conditions" cause of action. Woodcrest claimed that the information contained in the bidding documents was false and erroneous since it didn't disclose subsurface water on the site which would require extensive pumping and dewatering operations. It claims that it relied on the information it received, and that when it later discovered the subsurface water, it notified defendant, in accordance with Article 4 of the contract. The contracting officer disallowed the claim for additional compensation. Woodcrest proceeded under protest, but requested an extension of time to perform the work required by the contract. Defendant denied the request, and insisted that Woodcrest maintain the performance schedule. Woodcrest claims that it was thus required to incur increased expenses, for which it now seeks reimbursement.

The denial of the appeal by the BCA was based on the conclusion that plaintiff knew or should have known of the existence of a high ground-water table at the project site, and thus it was not misled by defendant's erroneous failure to show the ground-water table on the core boring logs.

Although there may be some evidence to support this conclusion that plaintiff knew or should have known of the existence of a high ground-water level, we think the particular facts of this case make such a Board finding erroneous in that the supporting evidence is not substantial.

■■ Since the claim is one "under" the contract, the suit is governed by the Wunderlich Act, 41 U.S.C. §§ 321–322 (1964), which accords finality to a Board's decision on matters covered by a Disputes Clause unless it is "fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." This court's scope of review under the Wunderlich Act is the same as that of Federal courts of appeals under

---

* This opinion incorporates portions of the opinion prepared by Commissioner Mastin G. White. With respect to the "Changed Conditions," the court reaches a different result from that of the Commissioner. The facts are stated in the opinion.

the standards of Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). See Carlo Bianchi and Co., Inc. v. United States, 167 Ct.Cl. 364 (1964), cert. denied 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965).

In *Universal Camera, supra,* the issue was the reviewability of orders of the NLRB in light of the Administrative Procedure Act and the Taft-Hartley Act. The test enunciated was whether there was substantial evidence on the record *considered as a whole.* In the instant case, there is not substantial evidence that plaintiff "knew" that there was a high ground-water level. In addition, the relatively small area actually affected by the high ground-water level militates against a finding that plaintiff "should have known" of the general presence of high ground-water level or of the danger that it may have been present.

The BCA found that only one-third of the area of the addition to the Telephone Exchange Building required dewatering, and that a mere one-tenth of the area of the Central Building addition required such an operation. In view of this fact, what was said in *Universal Camera,* supra, has special relevance:

> \* \* \* The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. \* \* \* *Id.* at 488, 71 S.Ct. at 464.

By and large, the area did not have subsurface water under it, and how plaintiff should have known of such a "condition" is not demonstrated by the facts. An attempt to show that there may have been a subsurface water condition in order to prove what plaintiff should have known, flies in the face of the fact that in general, the condition did not exist.

In Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965), the court held that plaintiff, having been warned about the likelihood of encountering permafrost on the excavation project, and having been furnished with information which should have alerted him to the existence of permafrost below the ground, was aware that some permafrost would be encountered. The court stated:

> \* \* \* These data furnished by the defendant to the plaintiff in connection with the bid papers were clearly sufficient to indicate to a reasonably prudent bidder that permafrost was widespread in the area of the two excavation sites and might well be encountered in performing the excavation work at the two sites, \* \* \*. *Id.* at 722, 345 F.2d at 541.

Had the Government core borings correctly indicated that ground water was present, we could say that plaintiff should have known of subsurface conditions.

The Government argues that although it may have misled plaintiff, the contract specifications as a whole, in addition to general knowledge and expert knowledge readily available to plaintiff, should have put plaintiff on the alert. The Board, in denying plaintiff's appeal on this point, made the same argument, when it said that:

> \* \* \* there were so many factors known or readily available to appellant on which the presence of a high water table could have been predicted, that appellant knew or should have known of the existence thereof. 66–2 BCA, ¶ 5726, at p. 26,696.

In looking at the various contract provisions, we are not convinced that the existence of a high water table must necessarily follow from them. The reference to draining and dewatering in the contract could just as easily have been referring to operations necessitated by rainfall; moreover, the dewatering equipment ordered by plaintiff could be used to remove rainwater as well as a high water table's subsurface water. Assuming however, that one could just as easily have inferred the possibility of rainwater from the various contract provisions as easily as one could have in-

ferred the presence of a high water table and subsurface water, it is our belief that the inescapable impression given by the core boring logs furnished bidders by the Government could have led to only one conclusion—that there was no subsurface condition. The BCA concluded otherwise, but we are not always bound by their decision. The Supreme Court stated:

> * * * Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. *Universal Camera Corp., supra,* 340 U. S. at 488, 71 S.Ct. at 465.

■ There are a number of reasons why the Government provides information to contractors. One reason is to provide a basis for a more accurate bid. Thus, when the contractor is presented with specifications which may or may not indicate a subsurface condition, and, in addition, is presented with boring logs showing that *no* subsurface water was encountered, we cannot conclude that the contractor should have known of such a condition, especially since the main purpose of such borings is to indicate subsurface conditions which would not otherwise be discovered.

Although no actual representation was made by the Government that there was no ground water, and thus, we cannot say that there was a warranty, the effect upon the contractor of furnishing core boring logs without indicating the ground water shown by such borings may be the same as if a representation had been made. In Atlantic Dredging Co. v. United States, 53 Ct.Cl. 490 (1918) aff'd 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920), a map was furnished by the Government to plaintiff. The legends on the map did not contain a true description of the material to be dredged, as encountered when the borings were made. The specifications stated that the

material to be dredged was of a certain kind, whereas, in reality, and as shown by the borings, they were of a different kind, and thus more expensive to dredge. Here, the logs furnished the bidder showed no subsurface water, and a contractor's assumption that therefore there was no subsurface water is only one step removed from an actual representation by the Government to that effect. In a situation such as we have here, where test results are shown, and they are contrary to what the Government knows to be true, what this court said in *Atlantic Dredging Co., supra,* applies as well:

> * * * It seems to the court that the bidder had a right to rely on information so given, * * *. *Id.* at 502.

■ The effect of an actual representation is to make the statements of the Government binding upon it, despite exculpatory clauses which do not guarantee the accuracy of a description. *Id.* at 503. Here, although there is no statement which can be made binding upon the Government, there was in effect a description of the site, upon which plaintiff had a right to rely, and by which it was misled. Nor does the exculpatory clause in the instant case absolve the Government, since:

> * * * broad exculpatory clauses * * * cannot be given their full literal reach, and "do not relieve the defendant of liability for changed conditions as the broad language thereof would seem to indicate." Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 584, (1957), cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108. As *Fehlhaber* said, general portions of the specifications should not lightly be read to override the Changed Conditions clause *Ibid.* United Contractors et al. v. United States, 368 F.2d 585, 598, 177 Ct.Cl. 151, 165–166 (1966).

The expert knowledge available to plaintiff was not so persuasive and consistent that plaintiff should have followed it, much less sought it. The "experts" who stated that subsurface water should have been anticipated based their

opinion on their own personal knowledge of the area. When this "general" knowledge is lined up against the boring logs, it is difficult to conclude that plaintiff. had he sought out the experts, should have believed them rather than the logs. The experts could only testify that there was a *possibility* of subsurface water; the borings, however, showed none. We cannot say that plaintiff was wrong in following "The most reliable and most specific indicator—the borings—* * *." See, United Contractors *et al. supra*, at 166–167, 368 F.2d at 598.

In view of the fact that the misleading boring logs would lead a contractor to conclude that there was no ground water, when coupled with other evidence which was inconclusive either way, we find that the BCA's determination that plaintiff knew or should have known is not supported by substantial evidence. Accordingly, on the "Changed Conditions" cause of action, we find that plaintiff was entitled to an extension of time.

## II—*"Changes" Claims*

In its opinion dated July 15, 1966, the Corps of Engineers Board of Contract Appeals also rendered decisions on claims submitted by Woodcrest under allegations that, as the result of erroneous interpretations by the defendant's personnel of contract drawings or specifications, Woodcrest had been required to do extra work, or to use types of materials, not contemplated by the pertinent contract drawings or specifications, as properly interpreted. These claims sought increases in the contract price and also time extensions for the performance of the work under the contract (with resulting diminutions of the liquidated damages assessed by the defendant because of delay in the completion of the work).

The claims mentioned in the preceding paragraph were apparently for "equitable adjustments" under the "Changes" provision of the contract. This provision stated in part as follows:

The Contracting Officer may, at any time, by written order * * * make changes in the drawings and/or specifications of this contract if within its general scope. If such changes, cause an increase or decrease in the Contractor's cost of, or time required for, performance of the contract, an equitable adjustment shall be made and the contract modified in writing accordingly. * * * If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions [relating to "Disputes"] * * *.

Although the contracting officer did not, as contemplated in the "Changes" provision, issue written change orders with respect to the matters now under consideration, it was evidently Woodcrest's theory that the extra items of work, or the more expensive materials, required of it as a result of the allegedly erroneous interpretations of contract drawings or specifications should be regarded as flowing from constructive changes in the pertinent contract drawings or specifications and, therefore, as compensable under the "Changes" provision of the contract. *Cf.* Jack Stone Co. v. United States, 344 F.2d 370, 376, 170 Ct.Cl. 281, 291–292 (1965); Gholson, Byars and Holmes Construction Co. v. United States, 351 F.2d 987, 994–996, 173 Ct.Cl. 374, 388–390, (1965); Turnbull, Inc. v. United States, 389 F.2d 1007, 1012, 180 Ct.Cl. 1010, 1020 (1967).

Woodcrest's "changes" claims were denied by the Corps of Engineers Board of Contract Appeals on July 15, 1966. As the Board's decisions on these claims involved (with one exception) the interpretation of contract drawings or specifications, the administrative decisions related to questions of law, and the Board's decisions are not binding on the court, which is authorized by the second section of the Wunderlich Act (41 U.S.C. § 322 (1964)) to consider these legal questions *de novo*. Schmid v. United States, 351 F.2d 651, 654, 173 Ct.Cl. 302, 309, (1965); Merritt-Chapman & Scott Corp. v. United States, 355 F.2d 622, 624, 174 Ct.Cl. 250, 254 (1966).

The several "changes" claims will be discussed separately in subsequent paragraphs of this opinion.

■ *Manholes*: One of Woodcrest's "changes" claims involved the question of whether the contract drawings, as properly interpreted, called upon Woodcrest to construct a couple of communication manholes, designated at C–1 and C–4.

The contract, in addition to calling for the construction of additions to the Central Control Building and the Telephone Exchange Building, also involved the construction of certain related works. Among these were some communication ducts and manholes.

The invitation for bids which the defendant furnished to Woodcrest and others prior to the submission of bids on the proposed contract included numerous drawings relating to the work that was to be performed under the contract. These drawings were subsequently incorporated in, and became part of, the contract.

Sheet 1 of the contract drawings contained (among other things) a legend that explained the meaning of various symbols used on other contract drawings. In connection with "Communication Ducts & Manhole," the legend indicated that the symbol for an "existing" communication manhole was a small square with the inner space clear, and that the symbol for a "new" communication manhole was a small square with the inner space cross-hatched.

Sheet 2 of the contract drawings was denominated the "Site Plan." This sheet depicted (among other things) small squares that symbolized four communication manholes. Nos. C–2, C–3, C–4, and C–5. The squares symbolizing Nos. C–2, C–3, and C–5 were cross-hatched thus indicating that these were "new" communication manholes. The symbol for No. C–4 was clear, thus indicating that this was an "existing" manhole.

Sheet 33 of the contract drawings was denominated "Communication Distribu-

tion." This sheet contained (among other things) diagrams indicating the manner of construction for five communication manholes, Nos. C–1, C–2, C–3, C–4, and C–5.

In the presentation of this particular claim, Woodcrest asserted before the Corps of Engineers Board of Contract Appeals that in the preparation of its bid, it relied on sheet 2 of the drawings as showing that communication manholes Nos. C–2, C–3, and C–5 were "new" and were to be constructed under the contract, as showing that manhole No. C–4 was an "existing" facility and was thus outside the scope of the contract, and as implying that manhole No. C–1 was an "existing" facility since it was not shown on the site plan. However, it subsequently turned out that communication manholes Nos. C–1 and C–4 were not in existence, and Woodcrest was required by the defendant to construct these manholes. To Woodcrest, this amounted to extra work which entitled it to additional compensation and additional time for the completion of the contract. However, the Board denied the claim, holding that "Sheet 33 was the controlling drawing for construction of the manhole system."

In this case, there was an obvious discrepancy between, on the one hand, sheet 2 of the contract drawings—the "Site Plan"—which clearly indicated that communication manhole No. C–4 was an "existing" facility and omitted No. C–1, and, on the other hand, sheet 33—relating to "Communication Distribution—which furnished instructions concerning the manner in which communication manholes Nos. C–1 and C–4 were to be constructed and thus clearly indicated that they were within the scope of the work to be performed under the contract. In such a situation, it was incumbent upon Woodcrest, in connection with the submission of its bid, to obtain a clarification from the defendant by making an inquiry as to whether communication manholes Nos. C–1 and C–4 were actually in existence and thus outside the scope of the work to be done under the

contract, or whether these were new facilities which the successful bidder would be expected to construct under the contract. Beacon Construction Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7, (1963); see Blount Bros. Construction Co. v. United States, 346 F.2d 962, 972–973, 171 Ct.Cl. 478, 496, (1965).

Under the circumstances, it appears that the court would not be justified in overruling the reasonable administrative interpretation to the effect that sheet 33 of the contract drawings, which related specifically to the communication system, "was the controlling drawing for construction of the manhole system."

■ *Chair Covering*: The addition to the Central Control Building was to contain a theater, with chairs installed by Woodcrest. One of Woodcrest's "Changes" claims involved the question of whether certain technical provisions in the contract specifications, as properly interpreted, made it necessary for Woodcrest to afford the defendant an opportunity to select the fabric for use as the covering for the theater chairs.

Section 37 of the technical provisions related to "Seating." The introductory portion of paragraph 37–02, dealing with "Materials," declared that:

Chairs shall be constructed as herein after [sic] specified or equal to TC–616 SCHOLASTIC chairs as manufactured by Heywood-Wakefield Company, Menomince [sic], Michigan.

Subparagraph "b" of paragraph 37–02 provided in part as follows:

The back shall consist of two parts —*upholstered panel* and metal back. The *upholstered panel* shall be of plywood * * * and covered with a 3″ wide layer of felted cotton extending across the top and down both sides securely fastened to plywood. The entire front surface of plywood shall then be covered with a rubberized curled hair pad one inch in thickness overall, and with a rubberized wool topper approximately ¼″ thick, *and the selected up-* *holstering fabric.* * * * [Emphasis supplied.]

Paragraph 37–03 required that shop drawings be submitted for approval, and further said that "Drawings shall include shop and erection drawings, including * * * *type of fabric* * * *" (emphasis supplied).

Paragraph 37–04 provided that "Samples as required shall be submitted to the Contracting Officer for approval."

Woodcrest proposed to furnish the TC–616 SCHOLASTIC chairs manufactured by the Heywood-Wakefield Company. The manufacturer produced this chair as a standard item with a muslin covering, and also produced it at a slightly higher price with a rather wide choice of fabrics for the covering. Woodcrest desired to use the standard chair with the muslin covering, but the defendant insisted that it had the right under the pertinent technical provisions to select a fabric for the chair covering. Woodcrest was ultimately required to provide theater chairs with a covering made of fabric selected by the defendant.

The Corps of Engineers Board of Contract Appeals denied Woodcrest's claim for an increase in the contract price because of the requirement that the more expensive fabric be used as the covering for the theater chairs.

The Board's interpretation of the pertinent technical provisions was proper. Paragraph 37–03 clearly indicated that the shop drawings should include a proposed "type of fabric" for the approval of the defendant, and subparagraph "b" of paragraph 37–02 provided for the use of "the selected upholstering fabric."

■ *Duct Bank*: Another of the "changes" claims sought an increase in the contract price and a time extension on the basis of allegations that after Woodcrest had drilled the holes for a duct bank in the cable vault of the addition to the Telephone Exchange Building, it was required by the defendant to redrill the holes and reinstall the ducts.

The Corps of Engineers Board of Contract Appeals denied this claim on the ground that the original installation of the duct bank was not accomplished in accordance with the requirements of the pertinent contract drawing.

The plaintiffs, in their motion and supporting memorandum, have not pointed out in what respect the administrative decision on this point is erroneous, and the portions of the administrative record examined do not disclose any proper basis on which the decision could be overruled.

■ *Asbestos-Cement Sheets*: In another claim, Woodcrest sought from the administrative agency an increase in the contract price and a time extension because the contract specifications called for a type of asbestos-cement material that was no longer being manufactured, and it was necessary to use a substitute material.

The contract specifications called for the use of asbestos-cement sheets conforming to Federal Specification SS–S–283. After Woodcrest began the performance of the work under the contract, it was learned that Federal Specification SS–S–283, which related to a solid asbestos-cement sheet, had been superseded by Federal Specification SS–B–755, which related to a perforated asbestos-cement sheet. The new perforated asbestos-cement sheets were used by Woodcrest, with the approval of the defendant.

Woodcrest's claim for an increase in the contract price and a time extension on account of this substitution was denied by the Corps of Engineers Board of Contract Appeals on the ground that Woodcrest had failed to prove that the substitution of the perforated asbestos-cement sheets caused any actual delay in the completion of the work or involved any additional cost to Woodcrest.

In the memorandum supporting their motion for summary judgment, the plaintiffs state that the substitute material "was more expensive," but they do not cite any evidence in the administrative record as sustaining this statement. Furthermore, no such proof was noted during the course of an examination of the administrative record.

It necessarily follows that there is no proper basis on which this particular administrative decision could be overruled.

### III—*Other Claims*

In disposing of the consolidated administrative proceedings on July 15, 1966, the Corps of Engineers Board of Contract Appeals denied a claim by Woodcrest for a time extension because part of the delay in the performance of the work under the contract was allegedly attributable to adverse weather conditions, and also denied a claim for a time extension and an increase in the contract price because of alleged dimensional discrepancies in the contract drawings.

As the plaintiffs' motion for summary judgment and supporting memorandum do not ask the court to review the administrative decisions mentioned in the preceding paragraph, it is unnecessary to discuss them.

DAVIS, Judge (concurring in part and dissenting in part):

I join the court's opinion on the claims under the "Changes" clause. As for the "Changed Conditions" aspect, I agree with Commissioner White that "the Board could reasonably accept, as it did, the Government's evidence as to the date when ground water was first encountered by Woodcrest, and the Government's circumstantial evidence indicating that Woodcrest was not misled by the defendant's erroneous failure to show the ground-water table on the core boring logs." Perhaps the most important piece of evidence on which the Board could, and did, rely was testimony that Woodcrest placed its initial order for the procurement of dewatering equipment five days prior to the time when ground water was first encountered in the per-

formance of the excavation work.[1]  As the commissioner said: "This indicated to the Board that Woodcrest expected to encounter ground water and was not misled by the defendant's erroneous failure to show the ground-water table on the core boring logs." In addition, the Board found, permissibly, that (in Commissioner White's words) "Woodcrest's president (who was in charge of the preparation and submission of Woodcrest's bid on the proposed contract) was familiar with Florida and had supervised the performance of construction jobs in different parts of that State, that he knew that the project site was located between and fairly close to the Atlantic Ocean and the Banana River, that he knew that the terrain was flat and lowlying, that he knew that the area had a heavy annual rainfall, that he knew that the subsoil which was to be excavated in connection with the performance of the contract consisted of sand, and that he knew that sandy land absorbs water rather than repels it." To me, all of this adds up to a substantial basis for the administrative conclusion that plaintiff was not misled. *See* Centre Mfg. Co. v. United States, 392 F.2d 229, 239, 240–241, 183 Ct.Cl. 115, 133–134, 135 (1968) (dissenting opinion); Sternberger v. United States, 401 F.2d 1012, 185 Ct.Cl. 528 (Oct. 1968); Koppers Co. v. United States, 405 F.2d 554, 186 Ct. Cl. —— (Dec. 1968).  I would uphold the Board's determination and dismiss the entire petition.

LARAMORE, Judge, concurs in the foregoing opinion concurring in part and dissenting in part.

COLLINS, Judge (dissenting):

On the authority of the factual situation in Leal v. United States, 276 F.2d 378, 149 Ct.Cl. 451 (1960), it is my opinion that the board had substantial evidence for concluding that the contractor was not misled (*compare id. with* Woodcrest Constr. Co., 66–2 BCA ¶ 5726, at 26,694–96 (ENG BCA 1966)). *See* Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965); cf. Fort Sill Associates v. United States, 183 Ct.Cl. 301, 307–308 (1968).

### CONCLUSION OF LAW

For the reasons set out, we conclude that the Corps of Engineers Board of Contract Appeals' decision on the "Changed Conditions" cause of action was not based on substantial evidence, and thus, its determination that plaintiffs were not entitled to recover is reversed.  We uphold the Board's decision, however, on the "Changes" cause of action, since it was supported by substantial evidence.

Accordingly, plaintiffs' motion for summary judgment on the "Changes" cause of action is denied, defendant's cross-motion is granted, and the case is dismissed as to this cause of action.

As to the "Changed Conditions" cause of action, the court grants plaintiffs' motion for summary judgment on the issue of liability, and denies defendant's cross-motion, with proceedings suspended for 90 days pending the Board's determination of plaintiffs' recovery consistent with our opinion.  Plaintiffs will comply with Rule 100 and the appropriate provisions of the General Order of the court of April 1, 1968, implementing it. Upon the conclusion of the Board's proceedings, plaintiffs will report the result to the court, and the parties will take further action for the final disposition of the case in this court.

---

1.  There was a conflict as to when ground water was first met; on this point, the Board chose to believe (as it had a right to do) the Government's witnesses rather than plaintiff's president.