This case is brought under the Wunderlich Act, 41 U.S.C. §§ 321, 322, on the record and the briefs submitted in support of cross-motions for summary judgment. Plaintiff, Pleasant Excavating Co., seeks review of the United States Department of Agriculture Board of Contract Appeals (Board) decision denying its claim for an equitable adjustment under the changed conditions clause of its contract with the defendant. We grant defendant’s motion supporting the Board’s decision and deny plaintiffs.
The agreement between the parties required Pleasant to build an earthen dam and spillway in the Pohick Creek Watershed in Northern Virginia. The contractor was to use soil excavated from borrow areas near the site. The materials available to prospective bidders included drill logs (soil samples analyzed for general composition and mineral and moisture content), site maps and a geologic report describing the ground and subsurface conditions in this area. The test pit data noted the presence of mottled soil and alluvium soil at elevations higher than the indicated water level.
Under the contract, only earth fill with a specified optimum moisture content could be used in the dam construction. In the spring of 1977, plaintiff encountered an unacceptably high moisture content in the soil which necessitated its drying most of the earth prior to using it. This desiccative process and the decreased excavation efficiency due to the unexpected wetness slowed down the operation, causing substantially increased costs.
On May 20, 1977, plaintiff filed a claim for an equitable adjustment to recoup the increased costs. It alleged that the wet conditions encountered were different from what was represented in the contract documents; this would fall under the differing site conditions clause in the agreement, requiring reimbursement by the Government for these costs. The Contracting Officer and the Board denied this claim and the contractor seeks review by this court. The question here is whether the Board permissibly found that Pleasant should have known from the test pit data and geologic report that it would encounter wet borrow conditions.
*656 The Board found that the test pit data was sufficient to put a reasonably prudent bidder or contractor on notice as to the potentially wet conditions in the borrow areas. The decision indicates that the tribunal did not impose an unreasonably high standard of knowledge on plaintiff but looked only to what could be expected of a reasonably competent contractor, not a soils expert. The first issue is whether the Board’s expectation that a layman should be familiar with the technical terms of a contract, including "mottles” and "alluvium,” was incorrect as a matter of law.
Contractors are not bound to know that which only an expert could derive from bidding materials. Kaiser Industries Corp. v. United States, 169 Ct. Cl. 310, 324, 340 F.2d 322, 330 (1965). Moreover, they are not expected to conduct their own expensive tests. Foster Constr. C.A. v. United States, 193 Ct. Cl. 587, 612-13, 435 F.2d 873, 886 (1970). The knowledge imputed to a contractor is the understanding that a reasonably competent bidder would have from reading the contract documents. Stock & Grove, Inc. v. United States, 204 Ct. Cl. 103, 119, 493 F.2d 629, 637 (1974). Contractors, however, are presumed to understand the complexities of their undertakings. Tony Downs Foods Co. v. United States, 209 Ct. Cl. 31, 42-43, 530 F.2d 367, 374 (1976); Massachusetts Port Authority v. United States, 197 Ct. Cl. 721, 726-27, 456 F.2d 782, 784 (1972). This includes an obligation to study the materials given to prospective bidders. Wickham Contr. Co. v. United States, 212 Ct. Cl. 318, 323, 546 F.2d 395, 398 (1976).
It seems reasonable that a bidder and contractor in this field should understand contract specifications related to water levels. Since the cost estimate for excavating is partially dependent upon the amount and level of subsurface moisture, a comprehension of the terms indicating wet conditions is crucial. Test borings, the primary source of such information, are usually considered of paramount importance to a person needing earth fill for construction. United Contractors v. United States, 177 Ct. Cl. 151, 162, 164, 368 F.2d 585, 596, 597 (1966). The absence of any indication of water in the test pit data is often considered a representation by the Government that optimum conditions will be encountered. Id.; Woodcrest Constr. Co. v. *657 United States, 187 Ct. Cl. 249, 255-56, 408 F.2d 406, 410 (1969), cert. denied, 398 U.S. 958 (1970). Conversely, evidence in the sample drillings of excessive moisture should put a contractor on notice of less than perfect conditions. Woodcrest, 187 Ct. Cl. at 254, 408 F.2d at 409 (dictum). It follows that plaintiff, as a reasonably competent contractor, should have understood the test pit data, including the terms mottles and alluvium. See Leal v. United States, 149 Ct. Cl. 451, 456, 460-62, 461 n.l., 276 F.2d 378, 381, 383-84, 384 n.1 (1960).
The next issue is whether the water level encountered should have been reasonably anticipated by a careful study of the bidding materials.[1] The core samples did indicate that, at the time of the tests, the water table level was below the elevation where Pleasant intended to excavate, leading plaintiff (it says) to believe that the amount of soil moisture would be ideal for its purposes. But the descriptive notations accompanying the data significantly qualified any water level representation. The very frequent use of the term mottled indicated that the water could potentially reach higher elevations.[2] The only ambiguity or contradiction in the bidding materials was a result of Pleasant’s failure to comprehend the implications of this repeated word.[3] A contractor cannot persuasively claim that it has been harmed by one misleading indication when that statement or fact has been qualified or negated other places in the instrument. Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 312 F.2d 408 (1963). As we now discuss, none of Pleasant’s contentions persuades us otherwise.
Plaintiff argues that the only evidence that it should have understood the term "mottles” comes from soil experts unqualified to testify as to what a reasonable contractor should have known. It is true that government *658 witness Mack was qualified to testify only as a soils scientist and geologist and not as a contractor. However, Mr. Widner, a civil engineer with the Soil Conservation Service (SCS) also testified that the data should have indicated to a contractor that the conditions were not optimum. Plaintiff attempts to discount Mr. Widner’s statements as those of a civil engineer who has taken special courses with the SCS. However, the record indicates that such courses were not in the soils sciences. In addition, the only evidence to the contrary offered by Pleasant, other than the testimony of Mr. Pleasants, the vice-president of the company, was by Mr. Kerslake. Mr. Kerslake also is a civil engineer with the SCS, and has had some soil mechanics training. His statements on the expected knowledge of a contractor were also given, not as a contractor but only as someone who has frequent contact with them. Moreover, he testified only that contractors he has talked with are not generally familiar with the term mottles. What Mr. Mack and Mr. Widner alluded to was that the term was knowable by consulting with the Dictionary of Geologic Terms. It was reasonable and adequate for the Board to conclude from the evidence that contractors should be sufficiently aware to at least inquire into the meaning of the word once it is found in the test pit data.
Plaintiff also argues that the fact that other bidders did not understand the data establishes that it was unreasonable to treat Pleasant as if it had comprehended. We find no evidence on the record, nor was any offered by the contractor, that the other contractors bidding on this project also failed to understand the data. The similarity in the bids is insufficient to establish this point. Other bidders were available but did not testify that they also were misled.
The Board found further support for its finding that the contractor should not have expected optimum moisture conditions in the geologic report. Consistent with its usual practice, plaintiff did not read nor request to review this document. It is settled, however, that contractors are bound by any information contained in bidding materials, whether they read them or not. Umpqua River Navigation Co. v. Crescent City Harbor District, 618 F.2d 588, 595 (9th Cir. *659 1980); Flippin Materials Co. v. United States, 160 Ct. Cl. 357, 363, 312 F.2d 408, 412 (1963).
There are two references in the report to the potential wetness of the borrow material. These indicated both the high-water table in the borrow area and the possibility that plaintiff would have to move further upstream to obtain earth fill which would be suitable. Pleasant says that these warnings were too low key compared to the explicit representations in the boring logs that only small amounts of moisture would be found at the intended excavation height. The answer is that the bidder-contractor is responsible for looking at all the contract documents, and that, as we have said, the core data here were not reassuring as plaintiff contends. If the contractor had taken the statements in the geologic report together with all the test data, it would have been sufficiently warned.
In this connection plaintiff says that the geologic report references (indicating wetness) are to a flood plain area not ever intended to be used for borrow material. There is no evidence for this proposition and we must conclude that the Board was not arbitrary, capricious, erroneous in law, or lacking in substantial evidence in its implicit finding that the report information on borrow material was relevant. In at least one instance, when the vice-president of the company was testifying as to the adequacy of his inspection of the site for the purposes of assessing the sufficiency of the available earth fill, he referred to the borrow area as part of the flood plain area; calling it the "flood plane (sic) borrow area.” Tr. 79.
Plaintiff also attempts to counter the adverse statements in the geologic report with others in that document. But these other statements spoke only to the adequacy of the amount of material and not the expected difficulty in using it.
Accordingly, without oral argument, the defendant’s motion for summary judgment is granted, the plaintiffs motion is denied and the petition is dismissed.

 We do not find it necessary to assess the adequacy of plaintiffs site investigation. The Board made no finding, and the defendant offers no proof, that a more extensive inspection would have exposed the moisture problem.

 Mottles are irregularly marked spots of differing colors in the soil which show previous water elevations.

 Alluvium, also frequently repeated in the test data and argued, by defendant, to indicate moisture, has been defined as soil placed by water action. Tr. 328. As plaintiff correctly points out, much of the world’s land formations were produced by water action. The presence of alluvium soil has not been shown on this record to indicate future water level problems for plaintiff.