**ETS–HOKIN CORPORATION and Bank of America National Trust and Savings Association, Third-Party Plaintiff**

v.

**The UNITED STATES.**

**No. 103–67.**

United States Court of Claims.

Jan. 23, 1970.

David V. Anthony, Washington, D. C., for plaintiff; Gilbert A. Cuneo, Wash-

ington, D. C., attorney of record, Charles E. Yonkers and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Kenneth M. Johnson, San Francisco, Cal., attorney of record, for third-party plaintiff; Theodore Sachsman, San Francisco, Cal., of counsel.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to prepare and file his opinion on the issues raised by plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on May 16, 1969, wherein such facts as are necessary to the opinion are set forth. Defendant filed exceptions (request for review by the court) to the commissioner's opinion and report. Plaintiff urged adoption by the court of the commissioner's opinion and recommended conclusions of law or, in accordance with the alternate grounds for relief, that the contract should be reformed to increase the contract price for furnishing and installing the ionization-type fire-detection systems. The case has been submitted to the court on oral argument of counsel, and briefs, of plaintiff and defendant. Since the court agrees with the commissioner's opinion, report and recommended conclusion, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as here-

inafter set forth. Therefore, plaintiff is entitled to recover and judgment is entered to that effect. The plaintiff's motion for summary judgment is allowed and defendant's cross-motion for summary judgment is denied. The amount of the recovery, and the respective rights of the plaintiff and the third-party plaintiff in such amount will be determined in subsequent proceedings under Rule 131(c), with the Corps of Engineers Board of Contract Appeals being allowed a period of 90 days, or such further period as the commissioner may determine, within which to make an initial determination concerning the amount of the equitable adjustment to which the plaintiff is entitled (unless such administrative determination is waived by the parties).

Commissioner WHITE'S opinion, with minor modifications by the court, is as follows:

This case involves a Wunderlich Act (41 U.S.C. §§ 321, 322) review of a decision that was rendered by the Corps of Engineers Board of Contract Appeals ("the Board") on November 7, 1966 (ENG BCA No. 2578) under the "disputes" provision of contract No. DA-41-443-ENG (NASA)-24 ("the contract").

The plaintiff, Ets-Hokin Corporation, and the defendant have filed cross-motions for summary judgment. Each relies on the administrative record to sustain its position.

It is my opinion that the Board's decision was erroneous, and that the plaintiff is entitled to recover in the present action.[1]

The contract was entered into between the plaintiff, a California corporation, and the defendant (represented by a contracting officer of the Corps of Engineers, Department of the Army) on

---

1. The amount of the recovery, and the respective rights of the plaintiff and the third-party plaintiff, Bank of America National Trust and Savings Association,

in such amount, can be determined in subsequent proceedings under Rule 131 (c).

March 26, 1963.[2] It provided for the construction by the plaintiff of the Integrated Mission Control Center, Phase II, at the Manned Spacecraft Center of the National Aeronautics and Space Administration ("NASA") located in Clear Lake, Harris County, Texas, for a total contract price of $7,879,401.32. The Integrated Mission Control Center is the building from which the astronauts are controlled while in space.

In making and administering the contract, the Corps of Engineers acted as construction agent for NASA.

Included among the work to be accomplished by the plaintiff under the contract was the installation of an automatic fire detection and alarm system in the new building. This phase of the work was governed by section 64 of the contract's specifications. From the standpoint of the present litigation, the crucial portion of section 64 was paragraph 64–10, which provided in pertinent part as follows:

> 64–10 FIRE–DETECTING UNITS shall be a type that detect the presence of the products of combustion. The units shall be specifically designed to detect burning of the material that will be installed in the area to be protected. They shall be capable of detecting the airborne products of combustion that are given off during the start of a fire before smoke is formed. Means shall be provided for adjusting the sensitivity of the unit after installation. * * *

The standard "changes" and "disputes" provisions which are customarily found in Government construction contracts were set out in paragraphs 3 and 6, respectively, of the contract's general provisions.

While the work under the contract was in progress, the plaintiff proposed to install a fire detection system consisting of Spurling 31 fire detecting units, supplemented by Gamewell smoke detec-tors. The Spurling 31 detector is activated either by a temperature rise of 15 degrees (or more) per minute or when the temperature reaches a predetermined point, usually 135 degrees Fahrenheit. The Gamewell smoke detector, as the name indicates, is activated by the presence of smoke. In this connection, it is relevant to note that the fire detection systems installed in the earlier buildings at the Manned Spacecraft Center consisted of Spurling fire detecting units.

However, representatives of the contracting officer took the position that the fire detection system which the plaintiff proposed to install under the contract would not meet the requirements set out in paragraph 64–10 of section 64 of the contract's specifications. After extensive correspondence, which began in the spring of 1963 and ultimately involved the contracting officer, the contracting officer rendered his final decision on July 11, 1963. The decision stated in part as follows:

> The detector proposed by you was disapproved * * * because of its failure to meet the specifications. The fire detecting units submitted for approval were a smoke detection system and a heat riser, which are not "capable of detecting the airborne products of combustion that are given off during the start of a fire before smoke is formed" as required by the contract specifications. * * *
>
> * * * * * *
>
> It is my interpretation that an ionization type detector is required by the contract. You have indicated * * * that you have been able to locate only one supplier of an ironization type detector, namely, Pyrotronics, Inc. * * * If you cannot locate another ionization type detector, you should submit the Pyrotronics detector for my consideration.
>
> The foregoing is the final decision of the Contracting Officer. Decisions

---

2. At that time, the plaintiff was operating under the name of Ets-Hokin & Galvan, Inc. References in the opinion to "the plaintiff" are to Ets-Hokin & Galvan, Inc., where appropriate.

on disputed questions of fact and on other questions that are subject to the procedures of the Disputes Clause may be appealed in accordance with the provisions thereof. * * *

* * * I cannot tolerate any further delaying tactics on your part while you try to force the use of a system which is unacceptable. If you fail to immediately proceed with submission of an acceptable system, I must take the action available to me under Clause 5, "Termination for Default—Damages for Delay—Time Extensions".

At the time in question, the Pyrotronics Division of Baker Industries was the only manufacturer of an ionization-type fire detecting unit. Such a unit is capable of detecting the gaseous products of combustion which form and are present before visible smoke results from the combustion. Accordingly, pursuant to the directive from the contracting officer that ionization-type detectors be installed, the plaintiff proceeded to install in the new building a fire detection system that consisted of Pyrotronics ionization-type fire detecting units. Such a system was more expensive than the Spurling-Gamewell system which the plaintiff proposed to install.

Although the plaintiff carried out the contracting officer's directive by installing Pyrotronics ionization-type detectors in the new building, the plaintiff took a timely appeal to the Board from the contracting officer's decision that the provisions of the contract required the installation of ionization-type detectors. In connection with the appeal, the plaintiff requested an equitable adjustment upward in the contract price, to consist of $460,330.79 as representing the alleged additional cost of furnishing and installing the Pyrotronics ionization-type fire detecting units, and of $56,153.50 as representing the liability allegedly incurred by the plaintiff as a consequence of breaching a contract to purchase Spurling 31 fire detecting units.

It is pertinent to note at this point that where a contract contains the standard "changes" provision and the contracting officer, without issuing a formal change order, requires the contractor to perform work or to utilize materials which the contractor regards as being beyond the requirements of the pertinent specifications or drawings, the contractor may elect to treat the contracting officer's directive as a constructive change order and prosecute a claim for an equitable adjustment under the "changes" provision of the contract. Jack Stone Co. v. United States, 344 F. 2d 370, 376, 170 Ct.Cl. 281, 291–292 (1965); Gholson, Byars & Holmes Construction Co. v. United States, 351 F.2d 987, 994–995, 173 Ct.Cl. 374, 388–390 (1965); Turnbull, Inc. v. United States, 389 F.2d 1007, 1012, 180 Ct.Cl. 1010, 1020 (1967); WRB Corporation v. United States, 183 Ct.Cl. 409, 420 (1968).

After holding a hearing in November 1965, the Board rendered its decision on November 7, 1966 (ENG BCA No. 2578). The Board denied the plaintiff's appeal. In doing so, however, the Board did not specifically hold—as had the contracting officer in his decision of July 11, 1963—that ionization-type fire detecting units were required by the provisions of the contract, and that the Spurling-Gamewell system which the plaintiff proposed to install did not meet the requirements specified in the contract. Instead, the Board's ultimate determination was that the plaintiff, in preparing its bid on the contract, "could and should have been able to discover the Governments' wishes and bid accordingly."

With respect to "the Government's wishes," the record before the Board showed that while the project for the construction of the building was under consideration, NASA was especially concerned over the fire detection system that would be installed in the building. This concern was understandable, since the proposed building was to have the function of controlling the astronauts

while in space. NASA had learned of the development of an unusual fire detecting unit which operated on the ionization principle and which could detect combustion gases even before they became visible as smoke. This device was manufactured by the Pyrotronics Division of Baker Industries. NASA informed the Corps of Engineers, its construction agent, of its wish that fire detecting units with a capability at least equal to that of the Pyrotronics ionization-type unit be installed in the new building. The Corps of Engineers passed this information on to the architect-engineer firm that was to draft the specifications for the proposed construction contract. The result was paragraph 64–10 of section 64 of the specifications, previously quoted in this opinion.

The invitation for bids on the proposed contract, containing paragraph 64–10 of section 64 of the specifications, was issued on February 15, 1963, with March 15, 1963 being indicated as the date for the opening of the bids. The plaintiff's bid was submitted on March 15, a short while before the deadline fixed for the opening of bids. The record before the Board showed—and the Board so determined—that at the time when the plaintiff prepared and submitted its bid on the proposed contract, the plaintiff did not have any actual knowledge (1) that NASA wished to have ionization-type fire detecting units installed in the new building, or (2) that any ionization-type detector had been developed and was in existence. Furthermore, the Board said in its decision that the pertinent contract language was not sufficiently clear that an experienced general contractor would necessarily recognize what was wanted by the defendant in the way of a fire detection system, since the contract language failed to indicate that the defendant desired a fire detection system which would detect the *gaseous* products of combustion. (As previously indicated, ionization-type fire detecting units, which NASA wished to have installed in the new building operate on the princi-

ple of detecting the gaseous products of combustion.)

It appears that the Board's ultimate determination that the plaintiff "could and should have been able to discover the Government's wishes and bid accordingly" was based in part upon a subsidiary finding to the effect that the plaintiff "mistakenly relied upon assurances from a distributor who knew what the Government wanted but who misled * * * [the plaintiff] into believing that the Government was buying something else."

With regard to the finding mentioned in the preceding paragraph, the record before the Board showed that on the night of March 14, 1963, while the plaintiff was in the rather hectic process of assembling, in a Houston hotel suite, quotations from potential suppliers and otherwise getting ready to submit its bid on the proposed contract, the plaintiff received from the Minneapolis-Honeywell Regulator Company a quotation in the amount of $96,000 for supplying (but not installing) fire detecting units; that on March 15, prior to the time set for the opening of bids, Minneapolis-Honeywell increased its quotation twice, to a final figure of $385,000; that on March 15, prior to the opening of the bids, the Alarm Signal Company of Texas, local distributor of Spurling fire detecting units, furnished the plaintiff a quotation in the amount of $80,000; and that about an hour before the bid opening the local distributor of Pyrotronics fire detection equipment submitted a quotation in the amount of $433,782. In view of the discrepancy between the Alarm Signal's quotation of $80,000 and the much higher quotations received from Minneapolis-Honeywell and the Pyrotronics distributor, the plaintiff got in touch with a Mr. Bray, of Alarm Signal, and asked that he confirm the correctness of his company's quotation. Mr. Bray did so, and also stated that the equipment which his company offered would meet the specifications. Mr Bray mentioned in this connection that the existing buildings at the Manned Space-

craft Center were equipped with Spurling fire detecting units supplied by his company. The plaintiff accepted Mr. Bray's statement and based its bid, in so far as the fire detection system was concerned, on the quotation of $80,000 which it had received from the Alarm Signal Company of Texas.

The plaintiff asserts in its brief that the Board's finding to the effect that Mr. Bray, of the Alarm Signal Company of Texas, "knew what the Government wanted" is not supported by *any* evidence in the administrative record. Since the defendant, in its answering brief, does not dispute the plaintiff's statement on this point, the plaintiff's assertion that the particular finding by the Board is wholly unsupported by any evidence in the administrative record can properly be accepted as correct, without making a detailed examination of the voluminous administrative record to verify the accuracy of such assertion.

In any event, there was no basis on which the Board could properly impute to the plaintiff knowledge supposedly possessed by a potential supplier but not disclosed to the plaintiff.

The Board's ultimate determination that the plaintiff "could and should have been able to discover the Government's wishes and bid accordingly" was also based in part upon a subsidiary conclusion by the Board that the plaintiff "could and should have obtained guidance from experts in the field" (who, presumably, would have been sufficiently sophisticated to equate the phrase "products of combustion" in the pertinent contract language with the invisible gases which are emitted early in the combustion process and, therefore, would have understood that the defendant desired a fire detection system consisting of ionization-type detectors).

The plaintiff, as a general contractor, is to be judged on the basis of the standard of what a reasonably experienced and intelligent general contractor would have understood upon reading the pertinent contract language. It may be assumed arguendo that a bidder confronted with technical language in an invitation to bid, recognizable as technical, should rely on the advice of persons who speak that language and may not jump to erroneous conclusions as to the meaning. There is, however, no evidence in this case that the failure of plaintiff's management to appreciate what the defendant wanted was due to any lapse in that regard. Plaintiff, counsel says, was or had been itself an electrical contractor. Counsel does not claim for it any excuse, grounded in technical ignorance, for not understanding the involved specification as much as anyone would. The difficulty, he argues, is that the specification did not say to anyone, layman or technician, what the Board holds it was intended to say, and that in any case, it has nothing in it that clearly excludes the items plaintiff intended to supply. With respect to such a standard, the Board indicated in its opinion that an experienced general contractor could not reasonably be expected to understand, upon reading the pertinent contract language, that the defendant wished to have installed in the new building ionization-type detectors which would be capable of detecting the gaseous products of combustion.[3] Nevertheless, the Board, in effect, held that the plaintiff was bound by the subjective intention of the defendant with respect to the type of fire detection system desired by the defendant, although the plaintiff did not actually know the defendant's intention and could not reasonably be expected to understand such subjective intention upon a reading of the pertinent contract language. This was

---

3. Included in this judgment was the fact that defendant added nothing to the specification to call bidders' attention to the novelty of the specification or that it attempted to embody special technical language or that it called for a specialized expert to undrstand it properly.

erroneous, since in such a situation the objective language actually used in the contract must prevail over the subjective intention of the drafter of the language. Jack Stone Co. v. United States, *supra,* 344 F.2d at p. 375, 170 Ct.Cl. at p. 289.

■ Still another partial basis for the Board's ultimate determination that the plaintiff "could and should have been able to discover the Government's wishes and bid accordingly" was a subsidiary finding to the effect that the plaintiff, while in the process of preparing its bid, "had been specifically warned that only Pyrotronics would meet the specifications." This subsidiary finding is supported by evidence in the administrative record to the effect that on the evening of March 14, 1963, while the plaintiff's bid manager was assembling quotations from potential suppliers and otherwise preparing the plaintiff's bid on the proposed contract, he was visited by a representative of the Johnson Service Company, the local distributor of Pyrotronics products, and was informed by such representative that only Pyrotronics detectors could meet the contract specifications for the fire detection system that was to be installed in the new building.

The Board did not explain—and it is impossible to comprehend—just how this statement by a Pyrotronics distributor should have alerted the plaintiff to the defendant's subjective wish that ionization-type fire detecting units be installed in the new building, particularly since the evidence before the Board clearly showed that the distributor did not mention ionization-type detectors to the plaintiff, that the plaintiff was unaware that the Pyrotronics Division of Baker Industries manufactured ionization-type detectors as well as conventional fire detection equipment, and that at about the same time when the Pyrotronics distributor visited the plaintiff's bid manager, the latter was being informed by other potential suppliers of fire detection equipment that only their respective units would meet the contract requirements.

■ Finally, the Board partially relied upon the disparity of the quotations which the plaintiff received from potential suppliers of fire detection equipment (ranging from $80,000 to $433,782) in making the Board's ultimate determination that the plaintiff "could and should have able to discover the Government's wishes and bid accordingly." Here, again, the Board did not explain —and it is impossible to perceive—just how the disparity in the quotations from potential suppliers should have alerted the plaintiff to the defendant's subjective wish to have ionization-type detectors installed in the new building, when the evidence before the Board showed that the plaintiff did not have any information regarding the development and existence of the ionization-type detector.

It must be concluded, therefore, that the administrative record lacks substantial evidence to support the Board's ultimate determination, based upon a subjective standard, that the plaintiff *could and should have been able to discover* "the Government's wishes" to have ionization-type fire detection equipment installed in the new building.

As previously indicated, the Board did not construe the language of the contract itself as requiring the installation of ionization-type fire detection equipment. On the contrary, the Board said in its opinion that the contract language would not have been understood by an experienced general contractor as requiring the installation of ionization-type detectors.

The Board's decision did not include a specific finding on the question of whether the Spurling-Gamewell fire detection equipment which the plaintiff planned to install in the new building met, or failed to meet, the requirements specified in the pertinent language of the contract. However, it is not necessary to have a determination by the

Board on this question in the first instance, since what is involved here is a matter of contract interpretation and this is a question of law which the court may properly consider *de novo* under the second section of the Wunderlich Act (41 U.S.C. § 322). Schmid v. United States, 351 F.2d 651, 654, 173 Ct.Cl. 302, 309 (1965); Merritt-Chapman & Scott Corp. v. United States, 355 F.2d 622, 624, 174 Ct.Cl. 250, 254 (1966); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 867, 181 Ct.Cl. 607, 626 (1967).

The standard is whether the plaintiff acted reasonably in interpreting the pertinent contract language as permitting the installation of a fire detection system consisting of Spurling 31 fire detecting units, which would be activated when the temperature reached a predetermined figure (usually 135 degrees Fahrenheit) or when the temperature increased at the rate of 15 degrees per minute (or more), and Gamewell smoke detectors, which would be activated by the presence of smoke.

In relation to the requirements set out in paragraph 64–10 of section 64 of the contract specifications, evidence before the Board showed that the Spurling-Gamewell equipment would have been capable of detecting "the presence of the products of combustion" [*i. e.*, heat, increase in temperature, and smoke, all of which are commonly understood to be products of combustion]; that such equipment was "specifically designed to detect burning of the material ＊ ＊ ＊ installed in the area to be protected" [since the burning would be reflected in heat and increase in temperature]; that such equipment was "capable of detecting the airborne products of compustion [*i. e.*, heat] that are given off during the start of a fire before smoke is formed"; and that means were "provided for adjusting the sensitivity of the unit after installation."

Therefore, it must be concluded that the Spurling-Gamewell fire detection equipment which the plaintiff proposed to install met the requirements specified in the pertinent contract language, as such language would reasonably be interpreted by an experienced general contractor, such as the plaintiff.[4]

It necessarily follows that the contracting officer committed error in rejecting the fire detection equipment which the plaintiff proposed to install and in requiring the plaintiff to install the more expensive ionization-type equipment not called for by the pertinent provisions of the contract, and that the Board erred in denying the plaintiff's claim for an equitable adjustment upward in the contract price by reason of the constructive change ordered by the contracting officer with respect to the fire detection equipment.

## CONCLUSION

The plaintiff's motion for summary judgment is allowed, the defendant's cross-motion for summary judgment is denied and judgment is entered for plaintiff. The amount of the recovery, and the respective rights of the plaintiff and the third-party plaintiff in such amount, will be determined in subsequent proceedings under Rule 131(c), with the Corps of Engineers Board of Contract Appeals being allowed a period of 90 days, or such further period as the commissioner may determine, within which to make an initial determination concerning the amount of the equitable adjustment to which the plaintiff is entitled (unless such administrative determination is waived by the parties).

4. An additional support for the reasonableness of the plaintiff's interpretation was the amendment to the specifications (prior to the bidding) which provided: "The automatic fire detection and alarm system shall be compatable and match the existing system for other buildings being served by the Central Fire Station, Building No. 25." Since these other buildings had used fire detection equipment of the type plaintiff expected to furnish, it was reasonable to interpret this amendment, in the circumstances, as further support for plaintiff's reading of the specification now in controversy.