HOPPMANN CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 365–86 C.

United States Claims Court.

Sept. 18, 1989.

Benjamin T. Riddles, II, McLean, Va., for plaintiff.

E. Kathleen Shahan, Washington, D.C., with whom was Stuart E. Schiffer, Acting Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

In this contract case, plaintiff, Hoppmann Corporation (Hoppmann), seeks an equitable adjustment under the change clause of its contract with the United States Department of Army (Army). In 1985 the Army awarded plaintiff a contract for installation of an audio-visual system at the National Defense University War Gaming and Simulation Center at Fort McNair, Washington, D.C. The Army requested bids for an audio-visual system comprised of four components—camera, lens, pan/tilt device, and remote controller for the pan/tilt device.

The Army's bid solicitation mentioned specific model numbers for three of the components, but said nothing about the model number for the remote controller.

Plaintiff won the bid and then proposed to supply a controller with eight pre-set positions. The Army insisted that the controller have 100 pre-set positions, a condition not mentioned in the bid specifications. After disputing the requirement, plaintiff supplied the controller demanded by the Army. Thereafter, plaintiff brought this action in the United States Claims Court to recover $218,589.00, the difference in cost between the proposed controller and the installed controller.

Plaintiff now moves for partial summary judgment, claiming that the bid solicitation left it with the discretion to select a suitable remote controller. Defendant cross-moves for summary judgment, contending that the solicitation contained a patent ambiguity which plaintiff did not clarify prior to bidding. After argument, held on August 2, 1989, this court rejects defendant's motion and grants plaintiff's motion for partial summary judgment.

## FACTS

In January 1985 the Army requested bids for an audio-visual system at the War College in Washington, D.C. Using wall-mounted cameras, this system would project selected images from a large gaming board to various locations outside the gaming control center. Paragraph 3.5.1 of the Bid Solicitation (¶ 3.5.1) described the technical specifications of the system:

3.5.1 Fixed Position Camera: Provide nine JVC 210 series cameras or equal wall mounted at locations detailed on the attached drawing. Cameras shall be remote controllable, pan, tilt and zoom full color equipped with switchable gain preamplifier. Remote camera control units are to be mounted in master control console with parallel controls located in the auditorium projection booth. These will be T.S.M. Model HS100P or equal with Lens Model HS–ZFSLD or equal.

The system contemplated four components: nine JVC 210 cameras or their equivalent, HS–ZFSLD lens or their equivalent, TSM HS–100P pan/tilt units or their equivalent, and remote control units for the pan/tilt devices. The specifications em-

ployed model numbers to help define each component of the system, except the controllers.

At the time of contracting, two different remote control units were compatible with the HS–100P: the TSM Model HS–CB with eight pre-set positions and the TSM Micro–Controller with 100 pre-set positions. Total Spectrum Manufacturing, Inc. (TSM) listed the TSM HS–CB alone as the control unit for the HS–100P on its Master Price List in effect at the time of contracting. The TSM Micro–Controller first became available in 1984, shortly before the bid solicitation and was not listed on a TSM Master Price List until May 1, 1985, after the contract award.

Both the HS–CB and the Micro–Controller are separate items of equipment from the TSM HS–100P pan/tilt unit.

Three contractors submitted proposals— Avtec Industries (Avtec) at $903,910.73, Robert Slye Electronics Incorporated (Slye) at $997,250.00, and Hoppmann at $726,-130.00. The Army performed a technical evaluation of all three proposals and found them acceptable.

In preparing its bid, plaintiff consulted the only TSM Master Price List in effect at the time.[1] Transcript of Proceedings, No. 365–86 C, filed Sept. 5, 1989 (Tr.) at 47. This price list contained the following references relevant to the solicitation:

| Item | Description | Dealer Price | List Price |
|---|---|---|---|
| HS–100P High Speed Preset Pan/Tilt System | High Speed Preset Pan/Tilt System. Control head has 1°–40° per second speed range. Preset return accuracy of less than ¼. Control head may be table or ceiling mounted. Velocity control unit mounts in 19″ rack and houses power supply and servo amplifiers. (Velocity control unit is pre-wired for zoom and focus servos). | $5,100.00 | $6,800.00 |
| HS–CS Preset Control Box for HS–100P | Control panel for HS–100P with 8 preset positions for pan/tilt/zoom/focus. Also includes manual control of all functions. | $1,800.00 | 2,400.00 |

The 1983 price list indicated that the HS–CB was the "preset control box for [the] HS–100P." This price list stated nothing about any other control box for the HS–100P. Therefore, when submitting its initial February 15, 1985 bid, plaintiff proposed to supply "the TSM control panel" which plaintiff understood at the time to refer solely to the HS–CB.

Mr. Robert Playford, Project Engineer for the Fort McNair project, drafted the solicitation for the Army. In drafting the solicitation, Mr. Playford consulted a new data sheet supplied by TSM. Tr. at 55, 61. The data sheet described the HS–100P High Speed Preset Servo Pan/Tilt System with Micro–Controller. The data sheet described some features of the HS–100P and

1. TSM designated the Master Price List in effect at the time of contracting as "Effective August 1, 1983."

then described the Micro–Controller in the following terms:

> Micro–Controller is the microprocessor control system with the capacity to preset up to 100 Pan/Tilt/Zoom/Focus positions.

Plaintiff's Brief, filed Feb. 7, 1989, (Pl.Br.) App. C, at 148. This data sheet apparently became available in 1984.[2] TSM's Master Price List, however, did not reflect the availability of a Micro–Controller until May 1, 1985.[3] Thus, the TSM price list consulted by plaintiff during bidding was different from the TSM data sheet consulted by Mr. Playford during drafting of the bid solicitation. Tr. at 52–53.

Because all three bid proposals substantially exceeded the $600,000.00 limit for the project, the Army issued an amendment to the solicitation on March 15, 1985. This amendment reduced the Government's requirements and opened negotiations with all three offerors. The amendment also requested that all bidders supply a list of equipment with a cost breakdown for the line items proposed in their bids.

At this point, plaintiff called the TSM supplier and sought confirmation that the HS–CB was still available at the price listed on the 1983 document. Mr. Jeffery W. Perryman, plaintiff's Manager of Cost Analysis, placed this call on March 18, 1985. This call came after plaintiff had submitted its original proposal. Mr. Robert Gonnelli, the Vice–President of TSM, took Mr. Perryman's call. During this conversation, Mr. Gonnelli informed Mr. Perryman that the 1983 price list remained in effect. Mr. Gonnelli also volunteered his belief that the Army wanted the TSM Micro–Controller instead of the HS–CB. Mr. Perryman asked whether Mr. Gonnelli possessed or had ever even seen a copy of the bid specifications. Mr. Gonnelli stated that he had not.

After the telephone conversation, Mr. Perryman conferred with Mr. Lynn Claudy, Hoppmann's Senior Project Engineer, who was responsible for reviewing the proposal. Mr. Claudy and Mr. Perryman reviewed the performance requirements of the contract and Hoppmann's proposed use of the HS–CB. They concluded that Mr. Gonnelli's statements were erroneous and that a Micro–Controller was not required. Accordingly, plaintiff continued on its previous course of supplying an HS–CB controller.

On March 25, 1985, Hoppmann submitted its revised proposal to the Army. This proposal did not include data concerning cost and pricing for the items of equipment that Hoppmann proposed to supply to the Army. The Army needed more documentation on the costs of the proposal. Therefore, the Army requested plaintiff to supply additional pricing data on the proposed equipment.

On April 4, 1985, plaintiff supplied the cost and pricing data on the proposed equipment. The contracting officer, Ms. Nella Meade, Mr. Playford, who had drafted the contract specifications, and another contracting official reviewed this list line-by-line.[4] The first page of plaintiff's list explicitly included nine "TSM HS–CB .Con. Pan." at a cost of $1,800.00 apiece. Pl.Br., App. B, at 744. None of the individuals reviewing the price and cost data raised questions about Hoppmann's proposal for an HS–CB control panel rather than a TSM Micro–Controller.

On April 8, 1985, the Army concluded technical negotiations and requested plain-

---

**2.** The oral argument featured some confusion over the availability of this document. At first plaintiff's counsel argued that this price list was not available at the time of contracting. Transcript of Proceedings, No. 365–86 C, filed Sept. 5, 1989, at 50–51. After clarifying the facts, however, plaintiff's counsel agreed that the data sheet was available at the time of contracting, though not in plaintiff's possession. Id. at 52–53.

**3.** The 1985 price list, effective May 1, 1985, indicated that both the Micro–Controller with

100 pre-set positions and the HS–CB were available to control the HS–100P.

**4.** The cost breakdown document, dated April 5, 1985, has markings beside many of the line items. Plaintiff's Brief, No. 356–86 C, filed April 5, 1989, App. B, at 744; App. G, at 595. The reviewers placed these marks on the document during their analysis. Annotations appear, for instance, adjacent to the HS–CB line on the document. *Id.*, App. G, at 595.

tiff to submit its final offer. Plaintiff submitted this offer on April 9, 1985, in the amount of $699,500.00. Based on its reading of the bid solicitation language, plaintiff's bid proposed HS–CB remote controllers. On April 12, 1985, the contracting officer awarded plaintiff the contract.

A few days after getting the award, plaintiff contacted TSM to order the camera equipment. Plaintiff learned that the TSM HS–CB control unit was "obsolete." However, TSM informed plaintiff that the more expensive Micro–Controller would operate the HS–100P pan/tilt device.

On April 25, 1985, plaintiff notified the contracting officer that it proposed to furnish, in place of the TSM equipment, a technically equal substitute at no additional cost to the Army. Plaintiff's April 25 letter clarified that it understood the HS–CB was obsolete and the only other TSM equipment available was more expensive.[5] Plaintiff proposed instead to supply a Vicon VPS 1200 microprocessor control system.

On April 30, the contracting officer requested Mr. Robert Krinko, Procurement Engineer, to evaluate the proposed Vicon's compliance with ¶ 3.5.1. Mr. Krinko responded by letter on May 1, 1985 that it "appears [the] Vicon system as offered complies with the requirements of ... Paragraph 3.5.1." Mr. Krinko also reported:

> Paragraph 3.5.1 is a functional requirement and it appears T–ASA is evaluating it with design criteria that were not provided.

Stip., ¶¶ 52–61.

By letter dated May 16, 1985 the contracting officer nonetheless rejected this alternative proposal for failure to meet the Army's needs. In rejecting the Vicon system, the contracting officer stated:

> T.S.M. has verified that the Micro–Controller Model HS100P is not obsolete and is required as part of the system.

As indicated earlier and as stipulated by the parties, Stip. ¶ 62, the Model Number

HS–100P refers only to the pan/tilt device, not to the separate TSM Micro–Controller.

In a May 23, 1985 letter, plaintiff clarified the distinction between the HS–100P and the Micro–Controller. On June 7, the Army responded with another rejection of the HS–CB controller and demand for installation of the Micro–Controller. The contracting officer stated that the HS–CB was unacceptable "because it has no ability to parallel control as required by Paragraph 3.5.1 ... in the Solicitation."

In June 1985, plaintiff contacted TSM again. Mr. Gonnelli told plaintiff about a new 1985 product, the Multi–Controller, for control of the HS–100P. On July 9, 1985, when plaintiff brought this option to the attention of the Army, the contracting officer ordered procurement and installation of this controller. A few months later plaintiff purchased the first Multi–Controllers TSM ever sold.

On September 4, 1985, plaintiff submitted a claim to the contracting officer for equitable adjustment under the terms of the contract. A new contracting officer requested the Defense Contract Audit Agency (DCAA) to review the revised claim. Mr. Gus K. Tebell, Systems Engineer DCASR PHI–GBAE, performed DCAA's technical review of the parallel control capabilities of ·the HS–CB proposal. He concluded:

> To meet the parallel control requirement, the contractor planned to provide a set of switches in the auditorium projection booth wired in parallel with those on the HS–CB boxes. This is considered legitimate parallel control by the undersigned.

Stip. ¶ 82. Mr. Tebell's analysis further stated:

> The Government's contention that the Multi/Micro–controller is required as part of the system (letter 16 May 1985) probably reflects the statement of an equipment company salesman desiring Government business. It is not considered to be supportable by the SOW [Statement of Work]. The primary advantage of the Multi/Micro–controller

---

**5.** In fact, TSM still offered the HS–CB for sale.

over the basic inexpensive control boxes (as advertised) is the number of preset positions available, 100 versus 8 per camera. Preset positions are not addressed in the SOW.

Stip. ¶ 88. Mr. Michael D. Savopoulos, PE, Chief of the Systems & Engineering Support Branch of DCASR, reviewed and endorsed these findings.

Based on these facts, plaintiff argues that the contract is not ambiguous. According to plaintiff, both the HS–CB Control Unit and the VICON alternative satisfy the terms of the contract. Moreover, plaintiff argues that even assuming that the contract terms are ambiguous, the ambiguity is latent and therefore should be construed against the Government.

In support of its motion for summary judgment, defendant asserts that the specifications contained a patent ambiguity that imposed upon plaintiff the duty to seek clarification. If the contract did not contain a patent ambiguity, however, defendant contends that the alternative control units offered by the plaintiff did not meet the contract specifications.

## DISCUSSION

The parties have stipulated the material facts of this case. Plaintiff has moved for partial summary judgment and defendant has cross-moved for summary judgment. Therefore, this case is ripe for resolution under RUSCC 56. In the absence of genuine fact issues and with both parties claiming entitlement to legal judgment, this court undertakes to resolve the issues as a matter of law.

■ The central legal question presented by this case is contract interpretation, namely, whether the Army's bid solicitation was ambiguous. A bid solicitation is ambiguous when its language permits two different and reasonable interpretations. *Sun Ship-building & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968); *Bennett v. United States*, 178 Ct.Cl. 61, 64; 371 F.2d 859, 861 (1967).

In other words, ambiguities occur in the form of obvious omissions in solicitation terms, inconsistencies between solicitation provisions, or discrepancies of significance. *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963). Not every omission, discrepancy, or incompatibility, however, creates a patent ambiguity. Rather the Claims Court noted that an omission must be obvious, a discrepancy must be significant, and an incompatibility must rise to the level of a glaring inconsistency before the ambiguity dictates a shift in the legal obligations of the parties. *Mountain Home Contractors v. United States*, 192 Ct.Cl. 16, 21, 425 F.2d 1260, 1263 (1970).

■ Specifically, when an omission is obvious, a discrepancy significant, or an inconsistency apparent, the resulting ambiguity becomes patent and imposes on the contractor a duty to inquire into the meaning of the cryptic language. Otherwise, when omissions, discrepancies, or inconsistencies are trivial or latent, the doctrine of *contra proferentem* operates. Under this doctrine, the court, notwithstanding latent omissions or discrepancies, construes the language in favor of a contractor's reasonable interpretation and against the drafter of the flawed language. *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 657, 505 F.2d 1257, 1261 (1974); *Chris Berg v. United States*, 197 Ct.Cl. 503, 514–15, 455 F.2d 1037, 1044–45 (1972); *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 301 (1988).

Thus, the Claim's Court's predecessor focused the inquiry for ambiguities, patent or latent, on the language of the contract. When weighing ambiguities, the Court of Claims stated that the question "is not the actual knowledge of the contractor, but the obviousness of the discrepancy [in the contract terms] which imposes the duty of inquiry." *Chris Berg*, 455 F.2d at 1045. To ascertain the existence or character of an ambiguity, the inquiry should focus on the contract or bid solicitation language, rather than on outside circumstances. *Ets–Hokin Corp. v. United States*, 190

Ct.Cl. 668, 678–79, 420 F.2d 716, 722–23 (1970).

The Court of Claims resolved latent ambiguities against the party who drafted the language. *See, e.g., Chris Berg,* 455 F.2d at 1044. This familiar rule, however, is subject to the condition that the alternative interpretation tendered by the other party must be reasonable. *Klingensmith,* 505 F.2d at 1261; *John C. Grimberg Co.,* 7 Cl.Ct. 452, 456 (1985). In this regard, the Claims Court has accurately stated:

> The alternative interpretation need only be within the "zone of reasonableness," [with] the Government shouldering "the major task of seeing that ... the words of the agreement communicate the proper notions...."

*Grimberg,* 7 Cl.Ct. at 456 (quoting *WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 6, 323 F.2d 874, 876–77 (1963)).

■ In light of these legal standards, the ambiguities, if any at all, in ¶ 3.5.1 of the Solicitation were not *"so glaring"* as to give rise to a duty to inquire. *Newsom v. United States,* 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982) (emphasis in original). The Army drafted ¶ 3.5.1 to describe the technical requirements for the audio-visual system. At the outset, the paragraph clearly requires nine JVC 210 cameras. Next the paragraph describes the control mechanisms for the wall-mounted cameras. The Army required pan/tilt units to adjust the movements of the cameras. These units, in turn, required remote controlling devices "mounted in [a] master control console with parallel controls located in the auditorium projection booth." The language requires "TSM Model HS–100P or equal," a specific model number for pan/tilt devices. Finally, the paragraph requires a specific model of lens, HS–ZFSLD, for the cameras.

Thus, ¶ 3.5.1 required four types of equipment—cameras, pan/tilt units, lens, and remote control devices. The bid solicitation mentioned a model number specifically defining three of the four types of equipment. Only the remote control devices were not defined by a model number. Yet the Army devoted a full sentence in the brief paragraph to describing the design specifications of the remote control devices.

Because it mentioned specific model numbers for three of the four components of the system, the Army could easily have mentioned the TSM Micro–Controller as well, if it desired to define more specifically the type of remote control device required for the bid. Instead, the Army described the specifications for the remote control devices without reference to a model number. At the time it drafted the solicitation the Army had in its possession the TSM data sheet which described the Micro–Controller. The Army could have included the Micro–Controller designation in the bid solicitation at the time of drafting.

Now during litigation, defendant attempts to convince this court that the absence of the TSM Micro–Controller designation was an omission. If so, the omission was in no way obvious. The Army took care to describe the remote control devices without reference to a model number. Rather than a model number, the Army included performance specifications for the remote control units.

Not only was this alleged omission latent, a careful contractor could reasonably interpret the specification to permit use of the HS–CB. The solicitation's language did not mention a model number to define the type of remote controller desired by the Army. Instead the Army noted some performance specifications for the remote controller. An acceptable remote control unit must be mounted in a master control console with parallel controls in the auditorium projection booth. The HS–CB fit this description. DCAA auditors found:

> [T]he contractor planned to provide a set of switches in the auditorium projection booth wired in parallel with those in the HS–CB boxes. This is considered legitimate parallel control....

Plaintiff's proposal satisfied the terms of ¶ 3.5.1.

Moreover, a reasonable contractor trying to ascertain what remote control devices are compatible with the desired HS–100P pan/tilt units would naturally check the price listings for TSM, the manufacturer of

the HS–100P. The TSM price catalogue listed the HS–CB immediately below the HS–100P, describing it as the "Preset Control Box for HS–100P" and as the "Control Panel for HS–100P." The TSM catalogue also described the HS–CB as providing "8 preset positions for pan/tilt/zoom/focus." This language reflected the bid specifications for "remote controllable, pan, tilt, and zoom" capabilities. Moreover, the next item on the TSM Master Price List was the HS–ZFSLD lens mentioned in the bid solicitation immediately after the HS–100P. In sum, the HS–CB fit well the description in the bid solicitation. A reasonable contractor could well conclude that the Army drafted ¶ 3.5.1 by referring to the TSM Master Price List. This list stated that the HS–CB was the control unit for the HS–100P.

Defendant nonetheless argues that ¶ 3.5.1 contains an ambiguity. Defendant emphasizes the single pronoun "These" in attempting to show the ambiguity. After describing the necessary features of an acceptable audio-visual system, ¶ 3.5.1 begins a new sentence: "These will be TSM Model HS–100P or equal." Because the preceding descriptions referred to both the mounted cameras and the remote control system, defendant contends that "These" could ambiguously refer to either the mounted cameras or the remote control units or to both. Tr. at 28.

The parties have stipulated that the "TSM Model HS–100P" is a pan/tilt device. This model designation did not refer to a remote control device or to a camera. The term "TSM Model HS–100P" refers only to a pan/tilt device manufactured by TSM. Indeed the TSM Master Price List available at the time of contracting specified that the HS–100P was a "High Speed Preset Pan/Tilt System."

In this context, the term "These" carried the important purpose of clarifying that the Army required more than a single pan/tilt unit. Instead, the Army wanted enough pan/tilt units to adjust each of the nine wall-mounted cameras. "These" helps clarify that the bid requires a pan/tilt capability for each of the cameras. "These" in the sentence "These will be TSM Model HS–100P or equal" refers to multiple pan/tilt devices.

"These" in the context of ¶ 3.5.1 does not create a patent ambiguity. In brief language, the bid solicitation expressed the Army's contracting intent. Paragraph 3.5.1 contains only four sentences. In the first sentence, the Army requires nine wall-mounted cameras. In the second sentence, the Army describes those cameras to include remote control, pan/tilt, and zoom capabilities. In the third sentence, the Army jumps to a description of the performance specifications of the remote control units. Finally, in the last sentence, the Army jumps again to specify the model number required for the pan/tilt units and lens.

The fourth sentence begins with the indefinite pronoun "These," but the specific model number designation provides sufficient context to clarify that the Army has shifted from discussing remote control units and cameras to discussing the model numbers for multiple pan/tilt units and lens. Nothing in the language flags a patent omission. Nothing in the language flags a patent discrepancy. Nothing in the language flags a patent inconsistency.

Defendant cites *Newsom*, 676 F.2d at 650, and *Beacon Constr.*, 314 F.2d at 504, to support its argument in favor of a patent ambiguity. In both of these cases, one part of the contract directly contradicted another. In both cases, the drawings disclosed something vastly different from the specifications. This kind of glaring inconsistency is not evident in the case at bar.

Defendant also makes several arguments that circumstances or documents outside the bid solicitation created, or should have flagged, a patent ambiguity. As mentioned above, this court's inquiry for an ambiguity must focus on the language of the contract or bid solicitation.[6] This lan-

---

**6.** Plaintiff filed a *motion in limine,* Feb. 7, 1989, requesting exclusion of evidence outside the contract language used by defendant to vary or

contradict that language. While this court could grant that motion, instead this court reviews the outside evidence and finds that it fails

guage does not disclose an ambiguity. Nonetheless, this court notes that, as a matter of fact, defendant's allegations concerning circumstances outside the contract documents do not give rise to a patent ambiguity. For instance, defendant argues that a TSM data sheet which refers to the HS–100P and the Micro–Controller should have raised questions about which remote controller the Army desired.

In the first place, neither the language of the bid solicitation nor any obvious ambiguities in the specifications alert a contractor to consult TSM sales literature in order to understand the Army's intent. Moreover, the TSM data sheet itself distinguishes between the HS–100P and the Micro–Controller. Thus, a contractor could read the data sheet and the bid specification without understanding that the Army desired the Micro–Controller over the HS–CB.

As already discussed, the language of the bid solicitation contained nothing to suggest that an acceptable bidder would need to consult the new TSM data sheet discussing the HS–100P and the Micro–Controller.[7] Neither the bid solicitation nor the accompanying drawings specify a brand name description for the remote control unit. Instead the document contained performance specifications for the remote control units. Although the Army now claims to have omitted the TSM Micro–Controller designation, that omission was not obvious. In this circumstance, plaintiff need not "exercise clairvoyance in determining its contractual responsibilities." *Corbetta Constr. Co. v. United States*, 198 Ct.Cl. 712, 723, 461 F.2d 1330, 1336 (1972). Nothing in the bid solicitation language suggested that plaintiff would need to consult TSM's sales literature when preparing an acceptable bid.

The TSM data sheet itself distinguishes between the HS–100P and the Micro–Controller. The bold type heading for the data sheet states: "HS–100P High Speed Preset Servo Pan/Tilt System *with Micro–Controller.*" (Emphasis added.) The data sheet does not suggest that the Micro–Controller is the sole remote control device compatible with the HS–100P. To the contrary, the data sheet's second page lists the HS–CB as an alternate control system for the HS–100P. Paragraph 3.5.1 permits the bidder to choose a remote control unit as long as the choice complied with the stated performance specifications. In the absence of a model designation to describe the complying remote control unit, a contractor could reasonably select either the HS–CB or the Micro–Controller. Both satisfied the specifications of ¶ 3.5.1.

Thus, a contractor reading the TSM data sheet would not detect any patent ambiguity or obvious omission in the Army's bid solicitation. The Army gave plaintiff no *reason to know of its requirement for a* Micro–Controller. In other words, "the objective language actually used in the contract must prevail over the subjective intention of the drafter of the language." *Ets–Hokin*, 420 F.2d at 723.

Defendant contends that TSM's informal conversations with plaintiff gave rise to an ambiguity which plaintiff had a duty to clarify. Prior to contract award, plaintiff called TSM to confirm that TSM's Master Price List remained in force. TSM's Mr. Gonnelli confirmed that the master price list was still valid. TSM's Mr. Gonnelli also stated his belief that the Army wanted the Micro–Controller. Mr. Perryman asked if Mr. Gonnelli possessed or had read the bid specifications. Mr. Gonnelli admitted that he had not. Thus, plaintiff confirmed that Mr. Gonnelli had volunteered information about a bid solicitation he had never seen.

Mr. Gonnelli was a sales agent for a vendor, not a party to the bid negotiations. Plaintiff could justifiably discount Mr. Gonnelli's observations as influenced by his desire to sell the more expensive Micro–Controller. Without having seen the speci-

---

to create a patent ambiguity in the terms of the bid solicitation.

**7.** As the Stipulations clarify, the Micro–Controller had only recently come on the market when the Army issued the bid solicitation. Therefore, the data sheet was new. In fact, plaintiff did not know of the data sheet until May 14, 1985 (after contract award). Pl.Br., Ex. C, at 145–49; Tr. at 53.

fications, Mr. Gonnelli's advocacy of his company's products, in the absence of some ambiguity in the bid solicitation itself, could not create an ambiguity. After the conversation with Mr. Gonnelli, plaintiff knew what TSM thought about the bid requirements, but what the Army thought about the bid requirements was expressed in the solicitation language. The Army did nothing to alter the language of the solicitation. Plaintiff could reasonably rely on that language.

Defendant argues for application of the *Cresswell* doctrine. In *Cresswell,* the Court of Claims stated:

If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended.

146 Ct.Cl. 119, 127, 173 F.Supp. 805, 811 (1959) (citations omitted). Mr. Gonnelli did not give plaintiff any reason to know what the Army intended to convey in the bid language. After conversing with Mr. Gonnelli, plaintiff knew the Army's intentions no better than before. Plaintiff knew better what Mr. Gonnelli, without apparent substantiation, believed to be the Army's intention, but the Army broadcast its actual intent in the clear language of ¶ 3.5.1. With this language issuing a strong signal, plaintiff could justifiably tune out sputtering interference.

After all, in *Cresswell,* the Government itself, not an uninformed vendor, clarified and explained its intent. *Cresswell,* 146 Ct.Cl. at 127. Moreover, in *Cresswell,* the contractor acted in conformance with that revealed intent until a dispute arose. *Id.* at 126–27.

The *Cresswell* doctrine does apply, to some degree in this case, but it was the Army which had reason to know of plaintiff's interpretation. After Mr. Gonnelli's comments, plaintiff submitted pricing information to the Army which explicitly listed the HS–CB. The contracting officer and the drafter of the bid specifications reviewed this detailed listing of the proposed equipment. Based on this review, the Army approved plaintiff's proposal. Once

again, plaintiff had no reason to know of the Army's Micro–Controller requirement.

To the extent that defendant appeals to circumstances outside the language of the bid solicitation to create a patent ambiguity, the totality of those circumstances does not raise enough questions about the bid solicitation to impose upon plaintiff a duty to inquire. Mr. Gonnelli's comments, by his own admission, did not reflect his understanding of the bid specifications and could be justifiably discounted as salesmanship. Moreover plaintiff had supplied the Army in advance of contract award with specific information about the type of remote control equipment proposed for the contract. The Army lodged no objections to plaintiff's proposal. Thus, circumstances outside the bid solicitation did not create a patent ambiguity. Nor did these circumstances give plaintiff any reason to know the Army's unwritten intentions.

In sum, the bid solicitation language, if it contained any ambiguity at all, contained no ambiguity that was sufficiently glaring to give rise to a duty to inquire. Furthermore, under the circumstances of this case, Mr. Gonnelli's remarks did not create such a glaring ambiguity. Plaintiff adopted a reasonable interpretation of the bid solicitation language. Therefore, the doctrine of *contra proferentem* requires this court to construe any latent ambiguity or omission against the Army.

Defendant contends as well that plaintiff's proposals did not satisfy the terms of the specification. In the June 7, 1985 letter directing plaintiff to install the Micro–Controller, the contracting officer declared the HS–CB unacceptable "because it has no ability to parallel control as required by Paragraph 3.5.1 in the Solicitation." DCAA's audit, however, indicated that plaintiff planned to install the HS–CB with parallel control capabilities. The proposed HS–CB satisfied the parallel control requirements of ¶ 3.5.1.

Mr. Playford recommended rejection of the HS–CB because it lacked the 100 preset memory capability of the Micro–Controller. The HS–CB had only eight pre-set positions. The bid solicitation, however, mentions nothing about a 100 pre-shot

memory or 100 pre-set position capability. This capability simply was not contained in the bid solicitation. In fact, in a May 6, 1985 letter, Colonel Terrance Ryan stated:

> To clarify our position, computer presets are required for the cameras but 100 presets is excessive to our needs.

In any event, 100 pre-set positions was not a requirement of the Army's bid solicitation. Therefore, plaintiff had no obligation to propose equipment satisfying an unstated and unknown requirement.

The Vicon system also satisfied the requirements of the bid solicitation. In a report which defendant left unrefuted, Mr. Robert Krinko stated that this Vicon system appeared to satisfy ¶ 3.5.1. Moreover, Mr. Krinko noted that the Army had evaluated the proposals according to criteria not provided by the bid solicitation.

### CONCLUSION

This case fits well within the general observation of the Court of Claims:

> The Government, as we are called upon to repeat so often, bears the full burden and the risk when it leaves its contract open to more than one reasonable construction.

*Singer–General Precision v. United States,* 192 Ct.Cl. 435, 447, 427 F.2d 1187, 1193 (1970). The Army did not specify within its bid solicitation what it apparently wanted a contractor to supply. The bid solicitation contained only latent omissions and ambiguities, if any at all, and therefore plaintiff could reasonably interpret the language as it did.

This court grants plaintiff's motion for partial summary judgment and denies defendant's cross-motion. Accordingly, this court directs the parties to file a Joint Stipulation as to the amount of judgment within 10 days of the issuance of this opinion. After the filing of the Joint Stipulation, this court directs the Clerk to enter judgment for the stipulated amount without further order of the court.